**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER GRISHAM, JAMES EVERARD,** | § § § | |
| *Plaintiffs* | § § | |
| **vs.** | § § | **Case No.: 5:20-CV-00387-OLG** |
| **RENE VALENCIANO, J. LOPEZ, HECTOR RUIZ, A. VERA, CITY OF OLMOS PARK** | § § § § | |
| *Defendants.* | § | |

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

---

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs Christopher Grisham and James Everard ("Plaintiffs" or "Plaintiff Grisham" or "Plaintiff Everard" respectively) file their *Response to Defendants' Motion for Summary Judgement*. In support thereof, Plaintiffs show the following:

*The freedom of individuals . . . to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.*[1]

## I.    PRELIMINARY STATEMENT AND STATEMENT OF THE ISSUES

This case centers on the March 27, 2018, detention and arrest of Plaintiffs for protesting the right to openly carry firearms following the recent arrests of open-carry activists in Olmos Park. Plaintiffs assert nine violations of their civil rights under Section 1983: excessive force

---

[1] *City of Houston, Tex. v. Hill*, 482 U.S. 451, 462-63 (1987).

(Count I), unlawful arrest (Count II), unlawfully preventing protected conduct (Count III), retaliation for protected conduct (Count IV), unlawful search and seizure (Count V), failure to intervene (Count VI), deprivation of property (Count VII), failure to provide medical care (Count VIII), and malicious prosecution (Count IX).

The parties filed cross-motions for summary judgment on November 5, 2021.  Plaintiffs now file a response to Defendants' motion for summary judgment.

## II.    RELEVANT FACTS

### A.  Relevant Events Leading up to Plaintiffs' Protest on March 27, 2018

**February 5, 2018**.  The following event kicked off a series of events that led to the issue before the court.  On February 5, 2018, Constitutional Rights activist, Mike Thompson, was arrested in the 4300 block of McCullough Avenue, Olmos Park, Texas by Sergeant Ruiz and Officer Viera simply because he was open carrying a rifle.[2]  Officer Viera did not arrest any other individual open carrying because no one called 9-1-1 on them.[3]  Sergeant Ruiz and Officer Viera received information during the original call of service that Thompson was not point the rifle at anyone.[4]

**February 10, 2018**.  Jack Miller, in protest of Mike Thompson's February 5th arrest and Olmos Park's handling of citizens lawfully open carrying firearms, openly carried a rifle in the 4300 block of McCullough Avenue, at the same location Mike Thompson was arrested.[5]  Olmos Park police officers detained Jack Miller at gunpoint and cited him for open carrying a firearm in

---

[2] https://www.youtube.com/watch?v=FxgaYsh0cQA. (0:44-1:20).
[3] *Id.* (6:30-7:30).
[4] Dkt. 74-1, pg 76.
[5] Dkt. 79-2; https://www.youtube.com/watch?v=rUGrQtExsgs (1:30-6:20).

violation of Section 24-85 of the Olmos Park City Code of Ordinances, a since-repealed ordinance.[6]

**February 16, 2018**.  Olmos Park Police Chief Rene Valenciano instructed his assistant, who is now the Olmos Park City Secretary, Kyndra Munoz, to create a PowerPoint.[7]  Chief Valenciano added information to the PowerPoint presentation that focused on Jack Miller.[8]  In the PowerPoint presentation, Chief Valenciano compared Jack Miller to the likes of mass shooters and cop killers.[9]

**February 20, 2018**.  Similar to Michael Thompson, Jack Miller lawfully stood in the 4300 block of McCullough Avenue with a rifle slung around him in protest. Jack Miller was detained and arrested at gunpoint.

**February 21, 2018**.  Jack Miller posted on his Facebook page that he disagreed with Olmos Park arresting anyone carrying a rifle in public. Chief Valenciano's PowerPoint presentation contained a screenshot of Jack Miller's Facebook post.[10]

**March 1, 2018**.  Chief Valenciano presented his PowerPoint presentation to local, state, and federal law enforcement officials.[11]

**March 5, 2018**.  Chief Valenciano directed the dissemination of his PowerPoint to dozens of local, state, and federal law enforcement officials.[12]

**March 16, 2018**.  Olmos Park Police Officer Lopez held Jack Miller at gunpoint for carrying a sign and having a toy firearm holstered on his hip.[13]  Officer Lopez detained Mr. Miller,

---

[6] https://www.youtube.com/watch?v=rUGrQtExsgs (6:20-20:41).
[7] Dkt. 79-3, 8:3.
[8] Dkt. 65-6.
[9] Dkt. 65-6.
[10] Dkt. 65-6.
[11] Dkt. 79-3, 21:4-15; Dkt. 65-7.
[12] Dkt. 44-2.
[13] Dkt. 79-2; https://www.youtube.com/watch?v=RzkaLIYzB6A&t=11s (1:06-3:08)

disarmed him, put him in cuffs, and placed in the back of his police vehicle.  Once Officer Lopez realized the firearm was not real, he released Mr. Miller.[14]

**March 17, 2018**.  Plaintiff Grisham sent in an open records request to Olmos Park requesting, among other things, the policy "on officers responding to individuals lawfully carrying a holstered handgun either carried openly or concealed."[15] City responded that it did not have any such policy.[16]  Also on this day, Alamo Heights dispatch was notified of potential "2nd Amendment Demonstrations" in Olmos Park in the near future.[17]  This information was relayed to Chief Valenciano.[18]

**March 19, 2018**.  Alamo Heights informed Chief Valenciano that they were receiving calls "about protestors flooding the area in Olmos Park along with additional 2nd Amendment folks."[19] Alamo Heights Chief of Police Richard Pruitt Sr. raised concerns with Chief Valenciano that Olmos Park was not answering calls when Alamo Heights attempted to transfer calls "from the 2nd Amendment folks expressing their dissatisfaction with recent events."[20]

**March 23, 2018**.  Olmos Park's City Manager sent a "Olmos Park Police Update Alert" stating: "During the last two months a group of individuals alleging to be gun activists have been detained and, in some situations, arrested by Olmos Park Police Officers.  This specific group also indicates via social media they desire to protest in person somewhere in the city."[21]  The Alert states that "**Texas is an 'Open Carry' state which authorizes persons to openly carry**[.]"[22]

---

[14] Dkt. 79-2; Dkt 74-1, pg 19, 68.
[15] Dkt. 79-4.
[16] Dkt. 79-5.
[17] Dkt. 74-1, pg 31.
[18] Dkt 74-1, pg 30.
[19] Dkt 74-1, pg. 66.
[20] Dkt 74-1, pg 100.
[21] Dkt 74-1, pg. 16.
[22] Dkt 74-1, pg. 17.

**March 26, 2018**.  Plaintiff Grisham contacted Chief Valenciano to inquire about the Chief's policy on handling those legally open carrying firearms in Olmos Park.[23]  Grisham specifically asked the Chief whether it was the policy of the Olmos Park Police Department to "pull[] their handguns and threaten[] a citizen[.]"  The Chief responded, "No . . . obviously that's-that's not anyone's policy."  Grisham then asked that if he were to go to Olmos Park if he was "gonna be forced on [his] face if [he] open carr[ied] there – at gun point."  The Chief responded he was not going to respond to Plaintiff Grisham since it was "a very unreasonable question to ask."  Grisham then indicated that he planned to go to Olmos Park even stating: "I'm afraid that you guys are gonna threaten me and put me on my face at gunpoint for doing nothing more than exercising my rights. . . ."  Chief Valenciano also acknowledged during the call that he was well aware that Texas was an open-carry state.  Chief Valenciano immediately briefed Defendant City about this call.[24]

**B.  Sequence of Events on March 27, 2018 – The Second Amendment People and Chief Implementing and Enforcing his Policy to "Squash[] the Rebel"**

**6:05 P.M. – 6:07 P.M.**  A 9-1-1 caller reported to Alamo Heights dispatch that "a male had an AK47 around his neck."[25]  Dispatch relayed the call of service to Olmos Park police officers and told them that the individual was in the 4300 block of McCullough Avenue.[26]  Chief Valenciano asked the dispatcher what the nature of the call was.  The dispatcher responded, "It looks like it's going to be the Second Amendment People."  Officer Lopez heard this information while on his way to the 4300 block of McCullough Avenue.[27]

---

[23] Dkt. 79-26.
[24] Exhibit D, 41:11-19.
[25] Dkt. 79-27; Dkt. 79-7.
[26] Dkt. 79-7.
[27] Dkt. 79-16, 33:7-9.

**Officer Lopez arrived on scene at 6:07 P.M.**[28]  Officer Lopez arrived on scene and observed Plaintiff Everard standing on the sidewalk with a rifle properly appendaged around his body.[29]  He noticed that Plaintiff Everard was not touching the rifle but was carrying a video camera.[30]  Officer Lopez knew that it was not a crime to for an individual to openly carry a firearm in public.[31]  Officer Lopez further testified that he knew it was not illegal to be in Olmos Park and carrying a rifle.[32]

Officer Lopez acknowledged that upon arrival and observing Plaintiff Everard, he did not have enough information to determine that a criminal activity was afoot.[33]  Nonetheless, Officer Lopez drew his firearm from his holster and demanded that Plaintiff Everard get on the ground.[34] He attempted to detain Plaintiff Everard, not because he suspected criminal activity, but because he did not know what Plaintiff Everard's intentions were.[35]  This is despite Officer Lopez being aware that this was a Second Amendment protest, that he had recent interactions with Second Amendment protestors at that location, that his department had a prior bulletin warning of future protests, or that CJ Grisham informed him that he had talked to his Chief already.

Within a few minutes of being on scene, Officer Lopez looked around and noticed other individuals standing around and observing the incident unfold.  He testified that the only individual he identified with a firearm was Plaintiff Everard.[36]  Officer Lopez never saw Plaintiff Everard reach for any weapon.[37]

---

[28] Dkt. 79-27.
[29] Dkt. 79-16, 104:5-16.
[30] *Id*. 87:12-22.
[31] *Id*. 9:20-25-10:1-2; 33:20-23.
[32] *Id*. 105:1-4.
[33] *Id*. 24:1-4.
[34] *Id*. 27:1-12; 28:20-22.
[35] *Id*. 30:1-22.
[36] *Id*. 25:11-23.
[37] *Id*. 71:1-6.

According to Officer Lopez's testimony, he thought that Plaintiff Everard's conduct was probably illegal simply because someone called 9-1-1 to report "a man with a gun."[38]  He was not sure whether Plaintiff Everard committed any crime until after Plaintiff Everard was sitting in a jail cell at Olmos Park and he had a chance to discuss with Chief Valenciano and Sergeant Ruiz.[39]

**Officer Viera arrived on scene at 6:08 P.M.[40]**  Olmos Park Police Officer Viera was the second officer to arrive at the scene.  He responded to the same dispatch call that Officer Lopez received.[41]  When Officer Viera stepped out of his vehicle, he grabbed his department issued AR 15 and demanded that Plaintiff Everard get on the ground.[42]  Officer Viera demanded that Plaintiff Everard get on the ground simply because he had a rifle.[43]  Officer Viera knew he was detaining Plaintiff Everard at this point.[44]  Officer Viera did not identify any specific articulable facts that resulted in him deciding to detain Everard.  He repeatedly testified that he did not rely on any other observation or information in evaluating whether criminal activity was afoot.[45]  Officer Viera certainly did not think that Plaintiff Everard was stoking fear or disorder as suggested by Defendants.[46]

**Sergeant Ruiz arrived on Scene after Lopez and Viera.**  Sergeant Ruiz arrived on scene and drew his firearm because he noticed that Officers Viera and Lopez had their firearms drawn.[47]  The officers did not communicate with one another, so they were all operating on the same

---

[38] *Id.* 107:16-25.
[39] *Id.* 111:1-12.
[40] Dkt. 79-27.
[41] Dkt 79-9, 19:4-7.
[42] *Id.* 19:13-18.
[43] *Id.* 21:2-4.
[44] *Id.* 44:10-17.
[45] *Id.* 40:11-19; 45:18-22.
[46] *Id.* 68:21-25 – 69:1-2.
[47] *Id.* 22:2-19.

information from dispatch.  Sergeant Ruiz noticed that Everard was not touching his rifle and was carrying a camera.[48]

Sergeant Ruiz did not identify any articulable facts to suggest a crime was being committed.  He suggested that because he was dispatched there, he had reasonable suspicion to detain Plaintiff Everard.  He specifically testified that he would only stop someone that was openly displaying a firearm if he was dispatched to the location.[49]  If he did not get a call and saw someone openly carrying, he was "not going to stop and investigate."[50]

Sergeant Ruiz looked around to observe the scene.  He saw several citizens with cameras and phones out, but he did not see any of them armed.[51]  He looked at their hands, saw phones and cameras, and overall, he did not think they were being unruly.[52]  Nonetheless, Sergeant Ruiz thought he had reasonable suspicion to detain Plaintiff Everard because "[h]e was armed" even though he knew that the mere fact of being armed in of itself was not a crime.[53]

**<u>Chief Valenciano Arrived on Scene and Within a Minute Tased Grisham.</u>**  Chief Valenciano arrived on scene after Sergeant Ruiz, Officer Lopez, and Officer Viera.  Chief Valenciano, unlike other officers, did not have his weapon drawn when he walked up to Everard and Grisham.[54]  Chief Valenciano could not state what specific articulable facts that he observed that authorized him to detain Plaintiff Everard.  He recognized that being on the sidewalk with a weapon is not enough; it would depend on if there was "odor of burnt marijuana emitting from his person" or whether they were "wearing a mask."[55]  These hypotheticals were missing from the

---

[48] *Id.* 23:12-19.
[49] *Id*. 14:6-20.
[50] *Id*.
[51] *Id.* 20:1-17.
[52] *Id.*
[53] *Id.* 32:14-21.
[54] https://www.youtube.com/watch?v=GrDAPPiu1QE (5:10).
[55] Dkt. 79-21, 106:7-25-107:1-12.

situation on March 27, 2018. Furthermore, Chief Valenciano omitted from his report any indication that he knew this was a Second Amendment protest, that there were a series of protests, or that he gathered information on alleged protestors.[56] The Chief did indicate in his report that there were several armed individuals flanking his officers (though this was not in video evidence, none of these alleged armed individuals were detained or arrested, and the Chief walked right up to Plaintiffs without drawing his firearm).

Chief Valenciano thought Plaintiff Grisham standing next to Plaintiff Everard was interfering with police duties.[57] Officer Viera then approached Plaintiff Grisham.[58] Plaintiff Grisham walk back and then Chief Valenciano tased him the back.[59] Plaintiff Grisham fell to the ground severely smacking his head on the sidewalk.[60]

**__Plaintiffs were Handcuffed, and Transported to Jail but Allegedly Not Arrested.__**
While Plaintiff Grisham was on the ground and profusely bleeding from his head, Officer Viera placed Plaintiff Grisham in cuffs. Officer Viera and Officer Lopez carried Plaintiff Grisham to the back of Officer Viera's car, with the taser probes still in his back, and then Officer Viera drove him to police station.

Within seconds of Plaintiff Grisham being placed in cuffs, Sergeant Ruiz, without any verbal commands, approached Plaintiff Everard, threw his camera on the ground, cuffed him, and forced him to his knees.[61] Sergeant Ruiz and Chief Valenciano then "pushed" Plaintiff Everard to

---

[56] Exhibit N.
[57] Dkt. 79-21, 204:4-25 – 205:1.
[58] Dkt. 79-4.
[59] *Id.*
[60] *Id.;* Dkt. 79-21, 75:23-25 – 76:1-2; and https://www.youtube.com/watch?v=GrDAPPiu1QE
[61] Dkt. 79-8; Dkt. 79-22, 29:1-21.

the ground.[62]  Once Plaintiff Everard and Plaintiff Grisham were in cuffs and transported from the scene, Chief Valenciano reported that he had "squashed the rebel."[63]

Apparently, Plaintiff Grisham and Plaintiff Everard were not "arrested" until after Chief Valenciano, Sergeant Ruiz, Officer Viera, and Officer Lopez huddled at the police station to go through the penal code.[64]  It was Sergeant Ruiz's responsibility to "make sure that [the officers have] their facts correct" and "[i]f anything is missing from the report, [he] makes sure they add it in there."[65]

### C.  Delay in Medical Treatment on March 27, 2018

After Chief Valenciano tased Grisham, Officer Lopez radioed a request for emergency medical services (EMS) for Grisham's possible head injury.[66]  When firetruck sirens are heard approaching, Chief Valenciano instructed dispatch, "Tell Fire to stand down. The area is not secure."[67] When the firetruck arrived at the scene, Chief Valenciano waved them away.[68]

Once at the station, EMS arrived to treat Mr. Grisham.  Initially, they were instructed by Defendants to stay back while Officer Viera attempted to move Mr. Grisham to a detainment cell.[69] After observing that Mr. Grisham could not stand, EMS intervened and treated him on the spot.[70] They discovered that the needles from the taser probes were still in his back.[71] He was transported to a hospital where doctors were finally able to treat his head wound and remove the needles.[72]

### D.  Post-Arrest Events at the Police Station between March 27-28, 2018

---

[62] Dkt. 79-22, 29:14-17.
[63] Dkt. 79-28, 0:50.
[64] Dkt. 79-16, 111:1-12; Dkt. 79-22, 69:18-25 – 70:1-7; 71:10-15.
[65] Dkt. 79-22, 41:16-22.
[66] Exhibit E.
[67] Dkt. 79-10, 4:00-9:20; Exhibit E.
[68] Dkt. 79-10, 4:00-9:20.
[69] Dkt. 79-20, 17:20-18:00; Dkt. 79-13, 16:40-18:05.
[70] Dkt. 79-13, 18:05-18:11.
[71] Dkt. 79-13, 20:10-20:20, 28:55-29:03.
[72] Exhibit F, (13:40-13:55).

On March 27, 2018, after Everard was taken to the Olmos Park Police Department, Chief Valenciano violently removed Mr. Everard from the squad car, and then used force when Mr. Everard asked about Mr. Grisham's injuries.[73] Mr. Everard was detained in a small room at 6:26 p.m.[74] At 6:51 p.m., Chief Valenciano placed leg irons on him in the detainment room then left him sitting in leg irons locked inside the room.[75]

When Mr. Grisham was released from the hospital at 11:38 p.m., Defendants placed in handcuffs and leg irons to be transported back to the station.[76] Defendants placed him in the same detainment room as Mr. Everard. While Defendants removed his handcuffs, they left him sitting in leg irons in the locked room.[77]

On March 28, 2018, at 12:42 a.m.—almost six hours later—Defendants brought Mr. Everard out of the cell to sign his property receipt but left him in leg irons. After signing the receipt, Defendants handcuffed him and then transported him to a vehicle to be transferred to the San Antonio Police Department.[78] At 12:46 a.m., while still in leg irons, Defendants handcuffed Mr. Grisham, removed him from the detainment cell, and placed him in a vehicle to be transferred to the San Antonio Police Department.[79]

When they finally received their property back, Mr. Grisham and Mr. Everard discovered that the SD card from Everard's video camera, and the entire contents of Grisham's cellphone had been deleted.[80]

### E. Outcome of the March 27, 2018, Arrests

---

[73] Dkt. 79-15, pp. 190-199.
[74] Dkt. 79-20, 18:25-21:42.
[75] Exhibit G.
[76] Exhibit H, (0:00-3:15).
[77] Exhibit I, (0:55-4:10).
[78] Exhibit J, (2:35-5:05).
[79] Exhibit K, (0:17-2:09).
[80] Dkt. 79-15, pp. 141-142; Dkt. 79-8; Exhibit L.

Plaintiff Grisham was charged with Interference with the Duties of a Public Servant, Obstruction of a Passageway/Roadway, Resisting Arrest, and Assault.[81] Plaintiff Everard was charged with Interference with the Duties of a Public Servant, Obstruction of a Passageway/Roadway, and Disorderly Conduct.[82] All charges were either denied by the district attorney or dismissed.[83]

Two days later, on March 29, 2018, Olmos Park's City Council repealed ordinance 24-85 because it violated state law.[84]

### F. Harm Caused by Defendants

As a result of Defendants' conduct, in addition to psychological damages and pain and suffering caused by this experience, Plaintiffs suffered physical harm. Mr. Grisham suffered a concussion, a serious abrasion to the back of his head, aggravated PTSD symptoms, and chronic migraines.[85] Mr. Everard suffered ligament damage in his wrist, a fractured thumb, a serious shoulder injury, and aggravated PTSD symptoms.[86] Mr. Everard also had to undergo surgery to repair the damage to his shoulder.[87]

### III. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is material if it might affect the outcome of the lawsuit under the governing law." *Estate of Potter v. Bexar Cty. Hosp. Dist*., No. SA-03-CA-55-PM, 2004 U.S. Dist. LEXIS 27496,

---

[81] Dkt. 79-17.
[82] *Id*.
[83] *Id*.
[84] Dkt. 79-18.
[85] Dkt. 79-4, pp. 217-225.
[86] Dkt. 79-15, pp. 154-155, 188-195, 206-211, 215-223.
[87] Dkt. 79-15, pp. 215-223.

at *18 (W.D. Tex. May 3, 2004). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict in favor of the nonmoving party." *Andres Holding Corp. v. Villaje Del Rio, Ltd*, Civil Action No. SA-09-CV-127-XR, 2011 U.S. Dist. LEXIS 23109, at *7 (W.D. Tex. Mar. 8, 2011); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). Thus, a genuine issue of material fact exists "if the evidence is sufficient for a reasonable jury to return a verdict in favor of the nonmoving party." *Villaje Del Rio*, 2011 U.S. Dist. LEXIS 23109, at *7. The burden of proof is on the movant to demonstrate no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Defendants have failed to do so.

## IV. ARGUMENTS AND AUTHORITIES

### A.  The Parties Agree Regarding the Evidentiary Weight Given to Video Recordings

Courts must "review evidence in the light most favorable to the nonmoving party, [and courts] **assign greater weight**, **even at the summary judgment stage, to the facts evident from video recordings taken at the scene.**" *Carnaby v. City of Hous*., 636 F.3d 183, 187 (5th Cir. 2011) (emphasis added) (citing *Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)). Plaintiffs' First and Fourth Amendment claims are clearly established by video evidence taken on March 27, 2018, leaving no genuine issues of material fact in favor of Plaintiff. In the alternative, disputed factual issues exist raising genuine issues of material facts that must be adjudicated in a trial by jury.

### B.  Defendants Are Not Entitled to Qualified Immunity

Defendants are not entitled to qualified immunity because they each, individually,[88] violated an established constitutional right of one or both of the Plaintiffs and in each instance, the

---

[88] *Meadours v. Ermel*, 483 F.3d 417, 421-422 (5th Cir. 2007) ("[G]overnment officials performing discretionary duties" can respond to [a 42 U.S.C. § 1983] claim by asserting qualified immunity. If they do, a court must consider each official's actions separately.").

constitutional right that was violated was clearly established law which a reasonable person would have known and genuine issues of material fact exist regarding the reasonableness of each official's conduct according to that law. If genuine issues of material fact exist regarding the reasonableness of each official's conduct according to the established law in question, the Fifth Circuit will "give greater weight . . . to the facts evident from video recordings."[89]

In determining qualified immunity, the court engages in a two-pronged inquiry.[90] First, the court determines "whether the facts alleged, viewed 'in the light most favorable to the party asserting the injury,' establish that the 'officer's conduct violated a constitutional right.'" [91] Second, "whether the right was clearly established at the time of the alleged misconduct." [92] The court "can analyze the prongs in either order or resolve the case on a single prong."[93] To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[94] "'The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'"[95] In other words, "in light of pre-existing law the unlawfulness [of the very action in question] must be apparent."[96]

---

[89] *Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021) (quoting *Valderas v. City of Lubbock*, 937 F.3d 384, 388 (5th Cir. 2019); *See also Scott v. Harris*, 550 U.S. 372, 380-381 (2007) ("When one party's description of the facts is discredited by the record, [a court] need not take his word for it but should view 'the facts in the light depicted by the videotape.'"); *Joseph v. Bartlett*, 981 F.3d 319, 325 (5th Cir. 2020) (Where a court 'proceed[s] through the facts in detail, including the disputed facts, considering each officer's actions independently,' it 'draw[s] these facts from the record, prioritizing the video evidence.'").

[90] *Cunningham v. Castloo*, 983 F.3d 185, 190 (5th Cir. 2020) (citing *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020)).

[91] *Blevins*, 957 F.3d at 600 (quoting *Trammell v. Fruge*, 968 F3d 332, 339 (5th Cir. 2017)).

[92] *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

[93] *Blevins* at 600 (citing *Morrow*, 917 F.3d at 874; *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[94] *Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

[95] *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (quoting *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013)).

[96] *Anderson*, 483 U.S. at 640.

A plaintiff is not required to identify a case "directly on point," but the case law must "place[] the statutory or constitutional question beyond debate."[97]

Defendants clearly violated Plaintiffs' constitutional rights to (1) be free from excessive force under the Fourth Amendment; (2) to be free from unlawful arrest under the Fourth Amendment; (3) to be free from abridgement of protected speech under the First Amendment; (4) to be free from retaliatory actions for engaging in protected speech under the First Amendment; (5) to be free from unlawful search and seizure under the Fourth Amendment; (6) to be free from the state's deliberate indifference to guaranteed constitutional rights under 42 U.S.C. § 1983; (7) to be free from unlawful deprivation of property under the Fourteenth Amendment; (8) to be free from the state's deliberate failure to render medical aid under the Fourteenth Amendment; (9) to be free from malicious prosecution; and (10) to be free from a municipality's deprivation of guaranteed constitutional rights under color of state law.

**1. Defendants clearly violated Plaintiffs' constitutional right to be free from excessive force during an arrest under the Fourth Amendment.**

The Fourth Amendment right to be free from excessive force during an arrest is clearly established.[98] In order to "prevail on an excessive-force claim, [a plaintiff] must show '(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'"[99]  Here, Plaintiffs suffered serious injuries resulting directly and only from Defendants' clearly excessive and unreasonable use of force on March 27, 2018.

**i. Injury and Causation**

---

[97] *Rivas-Villegas v. Cortesluna*, No. 20.1539, 2021 WL 4822662, *2 (2021) (citing *White v. Pauly*, 137 S.Ct. 548, 551 (2017).
[98] *Poole v. City of Shreveport*, 691 F3d 624, 627 (5th Cir. 2012).
[99] *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 727-728 (5th Cir. 2018) (citing *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (quoting *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012)).

Although a showing of significant injury is no longer required to sustain an excessive force claim, the Fifth Circuit requires a plaintiff to have "suffered at least some sort of injury" to sustain an excessive force claim.[100] The "injury must be more than a *de minimis injury* and must be evaluated in the context in which the force was deployed."[101] "As long as a plaintiff has suffered some injury, even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force."[102]

Here, Defendant Officers used so much force on Plaintiffs so as to cause them both serious injuries. Plaintiff Grisham was tased causing him to fall backward onto the pavement and smack his head on the pavement. As a result of the tasing and being dragged by his arms and legs to the police car, Plaintiff Grisham suffered a serious abrasion to the head, bleeding from the head, a concussion, aggravated PTSD symptoms,[103] and chronic migraines due to his injuries. Plaintiff Everard was cuffed and pushed to his knees. While on his knees Defendant Officers shoved Plaintiff Everard face first into the pavement for no lawful reason. Plaintiff Everard suffered ligament damage to his wrist, a fractured wrist and hand, a serious shoulder injury that required surgery as a result of being thrown to the ground and face shoved into the pavement.

### ii. Clearly Excessive and Clearly Unreasonable Use of Force

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on the facts and circumstances of each particular case.'"[104] A court should consider the totality of the circumstances when making this determination.[105] "The

---

[100] *Glen v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001); *Jackson v. Culbertson*, 984 F.2d 699, 700 (5th Cir. 1993).
[101] *Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir.2005).
[102] *Sam v. Richard*, 887 F.3d 710, 713 (5th Cir. 2018) (quoting *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017)).
[103] *See Dunn v. Denk*, 54 F.3d 248, 251 (5th Cir. 1995), rev'd on other grounds 79 F.3d 401 (5th Cir. 1996) (en banc) (applying the eggshell skull doctrine—"a tortfeasor takes his victim as he finds him"—to 1983 claims).
[104] *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).
[105] *Graham*, 490 U.S. at 396.

'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[106] "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[107] In determining whether excessive force was used, taking into account the totality of the circumstances, the Supreme Court has analyzed several factors.[108] This case is not the sort of "split-second judgment" scenario discussed in *Graham* and so passionately relied on by Defendants.[109]

The reason why Sergeant Ruiz and Chief Valenciano cuffed Everard and pushed him down was so they could conduct an illegal search.[110] They lacked reasonable suspicion and probable cause that he had committed any crime. Chief Valenciano asserts he shot Grisham with his Taser because he may have touched Officer Viera. Video evidence establishes Grisham did not touch Officer Viera.[111] All officers were void of articulable facts.

Due to their protests of Defendant City's unconstitutional law, and Chief Valenciano's policy that Plaintiffs were "rebel[s],"[112] Everard was criminally charged with three Class B misdemeanors[113] and one Class A misdemeanor.[114] Grisham was criminally charged with two

---

[106] *Id.*
[107] *Id.* at 396-397.
[108] "The Supreme Court has identified three sets of facts which deserve careful consideration in determining whether the force used is 'excessive' or 'unreasonable': (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Cuellar v. Duboise*, No. AU-17-CA-00223-SS, 2018 U.S. Dist. LEXIS 175810, at *9 (W.D. Tex. Oct. 11, 2018) (citing *Graham*, 490 U.S. at 396).
[109] Dkt. 81. ¶29.
[110] Dkt. 79-21, 162:2-4; Dkt. 79-22, 30:11-14.
[111] Dkt. 79-10. (5:45-5:55).
[112] Dkt. 79-14. (9:54-10:00).
[113] Interference with Duties of a Public Servant – Sec. 38.15, Obstruction Passageway/Roadway – Sec. 42.03, Disorderly Conduct-Display Firearm – Sec. 42.01.
[114] Resist Arrest-Search-Transportation – Sec. 38.03.

Class B misdemeanors, a second degree felony based on the untruthful notion he touched Officer Viera, and one Class A misdemeanor.[115] All of the charges filed (and promptly dismissed) against Plaintiffs (except one falsely charged felony against Grisham) , were minor misdemeanor offenses which militated against the use of force.[116]

Where a court "proceed[s] through the facts in detail, including the disputed facts, considering each officer's actions independently," it "draw[s] these facts from the record, prioritizing the video evidence.'"[117]  The permissible degree of physical coercion depends on "the severity of the crime at issue, whether the [individual] poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[118]

### a)  Severity of the Crime

Here, Plaintiffs never exhibited any signs of violence, nor did officers suspect Plaintiffs of being violent criminals on March 27, 2018. Defendant Officers were informed before arriving on scene that it was "the Second Amendment people" and no one was pointing any weapons at anyone.  The dispatcher confirmed to other callers that it was "the Second Amendment people."[119] Defendants had firsthand knowledge of these types of protests occurring during that period. Plaintiffs were walking on a public sidewalk while open carrying, which Defendant Chief

---

[115] Interference with Duties of a Public Servant – Sec. 38.1, Assault of a Public Servant – Sec. 22.01, Obstruction Passageway/Roadway – Sec. 42.03, Resist Arrest-Search-Transportation – Sec. 38.03.

[116] *Reyes v. Bridgwater*, 362 Fed. Appx. 403, 407 n.5 (5th Cir. 2010) (concluding the "severity" factor in the *Graham* analysis militated against the use of force where the crime was "at most a misdemeanor"); *Jimenez v. Wood Cty.*, 660 F.3d 841, 848 (5th Cir. 2011) (finding Class A misdemeanors are minor offenses under a Fourth Amendment analysis); *Westfall v. Luna*, 903 F.3d 534, 547 (5th Cir. 2018) (noting a Class B misdemeanor was a minor offense).

[117] *Joseph v. Bartlett*, 981 F.3d 319, 325 (5th Cir. 2020); *See also Scott v. Harris*, 550 U.S. 372, 380-381 (2007) ("When one party's description of the facts is discredited by the record, [a court] need not take his word for it but should view 'the facts in the light depicted by the videotape.'").

[118] *Graham*, 490 U.S. at 396.

[119] Exhibit M.

acknowledged to Grisham the day before he knew was legal to do in the State of Texas.  Plaintiff Grisham had a handgun strapped to his waste, and Plaintiff Everard had a rifle slung across his chest. Plaintiffs were both holding video cameras and recording the public view.  None of the Plaintiffs ever touched their firearms.

On March 27, 2018, Plaintiffs had an established First Amendment right to be present on public sidewalks.[120] Plaintiffs had a statutory right to be present on public sidewalks in Texas while open carrying a firearm.[121] Plaintiffs were engaged in constitutionally protected conduct when they were recording while open carrying on a public sidewalk.[122] Plaintiffs had a clearly established constitutional right to record the police.[123]

In a sister state case, the Circuit Court held, "while open-carry laws may put police officers . . . in awkward situations from time to time, the  legislature has decided its citizens may be entrusted with firearms on public streets [and] . . . the police department has no authority to disregard this decision—not to mention the protections of the Fourth Amendment—by detaining every gunman who lawfully possesses a firearm."[124]  The Texas legislature, similarly, has decided its citizens are entrusted with firearms on public streets.[125] If it is appropriate to presume that citizens know the parameters of the laws, it is surely appropriate to expect the same of law enforcement officers (as clearly acknowledged by Chief Valenciano in speaking with Grisham,

---

[120] *United States v. Grace*, 461 U.S. 171 (1983) (recognizing that sidewalks and parks are considered, without more, to be public forums").

[121] Tex. Gov't Code Ch. 411, Subsection H (House Bill 910) (effective January 1, 2016).

[122] *Turner v. Driver*, 848 F.3d 678, 688-689 (5th Cir. 2017) (quoting *ACLU v. Alvarez*, 679 F.3d 583, 596 (7th Cir. 2012) ("[T]he First Amendment protects film as a medium and the act of filming as 'there is no fixed First Amendment line between the act of creating speech and the speech itself.'")).

[123] *Turner*, 848 F.3d at 690 ("Moreover, 'the filming of . . . police officers performing their responsibilities [in a public place] fits comfortably with basic First Amendment principles,'" and further explaining that, among other reasons, filming contributes to the public's ability to hold police accountable and ensures that officers are not abusing their power)).

[124] *Northrup v. City of Toledo Police Dept.*, 785 F.3d 1128, 1133 (6th Cir. 2015); Ohio Rev. Code §§ 9.68, 2923.125.

[125] Tex. Gov't Code Ch. 411, Subsection H (House Bill 910) (effective January 1, 2016).

Chief's PowerPoint, and the City of Olmos Park's bulletin published to other agencies—all prior to this incident). Federal and State laws in existence on March 27, 2018, establish that Plaintiffs were lawfully armed persons. Thus, the severity of the crime at issue (if any exists) weighs in favor of the Plaintiffs.

### b) *Immediate safety threat*

Plaintiffs did not pose an immediate safety threat to the public or Defendant Officers in Olmos Park on March 27, 2018. Defendants were not in a high-pressure situation that would require split-second decisions. Like the plaintiff in *Washington v. Salazar*,[126] Plaintiffs here were not carrying their guns in a threatening way.[127] Defendants suspected Plaintiffs were Second Amendment activists, knew they were in Olmos Park to peacefully protest the City's Ordinance that conflicted with state law, and knew they did not intend to threaten the officers or the public in any way.[128] This is why, for example, Chief Valenciano walked up to Plaintiffs without his weapon drawn. Defendants' only desire was to "quash the rebel." A jury could conclude that no reasonable officer would have perceived Plaintiffs posed an immediate threat to the Officers' or public's safety.[129]

### c) *Resisting arrest or attempting to evade arrest by flight*

At no time did Plaintiffs resist arrest or attempt to evade arrest by flight. As of 2013, the court clearly established that "violently slam[ming] an arrestee who is not actively resisting arrest"

---

[126] *Washington, v. Salazar*, 747 Fed. Appx. 211 (5th Cir. 2018).
[127] *Id.* at 215. (finding that Washington "walk[ed] down the street with a shotgun at his side, pointed at the ground, speak[ing] to valets on the sidewalk. There was no indication Washington carried his shotgun in a threatening way. And it is not unlawful to openly carry a firearm in Texas, aside from the enumerated proscriptions in the Penal Code.)).
[128] Every video of the incident portrays Plaintiffs repeatedly declaring that they were not there to harm anybody and they were not a threat.
[129] *Hanks v. Rogers*, 853 F.3d 738, 743m 746 (5th Cir. 2017); *Ramirez*, 716, F.3d at 378 (5th Cir. 2013); *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009).

is a constitutional violation.[130] Passive resistance does not authorize violent force on an officer's part.[131] The Fifth Circuit repeatedly rejects qualified immunity in cases in which "officers face verbal resistance but no fleeing suspect."[132] Plaintiffs here, like plaintiff in *Tucker v. City of Shreveport* (2021)[133] "offered some degree of verbal resistance."[134] Even so, "in the absence of overt physical resistance," or "flight or the prospect of flight," Plaintiffs cannot be said to be resisting arrest in the context of an excessive force claim.[135]   As of February 26, 2013, "clearly established law demonstrated that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming force rather than continuing verbal negotiations with an individual who poses no immediate threat, or flight risk, who engages in, at most, passive resistance."[136]

Plaintiffs never exhibited any signs of violence, nor did Defendants suspect Plaintiffs of being violent criminals, Plaintiffs did not pose an immediate safety threat to the public or to the Defendant Officers; and at no time did Plaintiffs resist arrest or attempt to evade arrest by flight. Defendants are not entitled to qualified immunity because they violated Plaintiffs Fourth Amendment right to be free from the excessive and unreasonable force used to take them down.

## 2. Defendants clearly violated Plaintiffs' constitutional right to be free from unlawful arrest under the Fourth Amendment.

Defendants violated Plaintiffs clearly established constitutional right to be free from an unlawful arrest absent probable cause[137] and are not entitled to qualified immunity. A seizure [of

---

[130] *Tucker v. City of Shreveport*, 998 F.3d 165, 175 (2021) (first citing *Darden*, 880 F.3d at 731 and then citing *Ramirez*, 716 F.3d at 377-378).
[131] *Deville*, 567 F.3d at 167-168.
[132] *Bone v. Dunnaway*, 657 Fed. Appx. 258, 263 (5th Cir. 2016) (per curiam) (citing *Deville*, 567 F.3d 169); *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008); *Goodson v. City of Corpus Christi*, 202 F.3d 730,734, 740 (5h Cir. 2000).
[133] *Tucker v. City of Shreveport*, 998 F.3d 165 (2021).
[134] *Id.* at 176.
[135] *Id.*
[136] *Hanks*, 853 F.3d at 747.
[137] *Brower v. County of Inyo*, 489 U.S. 593, 595 (1989).

the person] must be "justified at its inception."[138]   A lawful arrest "must be accompanied by probable cause."[139]  "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was committing," an offense. [140]  To determine whether an officer had probable cause for an arrest, the court "examine[s] the events leading up to the arrest, and then decide[s] 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause."[141]   The "totality of circumstances" requires a court to consider "the whole picture."[142] The Supreme Court recognized that "the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation."[143]

Here, Defendants had several interactions with open-carry protestors at the same location over a period spanning weeks.  Leading up to March 27, 2018, Chief Valenciano prepared a PowerPoint and briefed his concerns of continued protests to the City as well as local, state, and federal law enforcement agencies.  On March 26, 2018, Chief Valenciano's call with Mr. Grisham, and his subsequent reporting of the phone call to the City, also supports this.  Lastly, on March 27, 2018, the officers and dispatch knew what was going with the phrase, "it looks like it's going to be the Second Amendment People."  Then, after Chief tased, detained, and arrested Plaintiffs, he reported to everyone that he "quashed the rebel." Defendants were unquestionably aware of Plaintiffs' purpose—to peacefully protest Olmos Park's Ordinance that was inconsistent with the

---

[138] *United States v. McKinney*, 980 F3d 485, 490 (5th Cir. 2020) (quoting *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185 (2004)).
[139] *Freeman v. Gore*, 483 F.3d 404, 408-409, 413 (5th Cir. 2007).
[140] *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004) (quoting *United States v. Levine*, 80 F.3d 129, 132 (5th Cir. 1996)).
[141] *District of Columbia v. Wesby*, 138 S.Ct.577, 586 (2018).
[142] *United States v. Cortez*, 449 U.S. 411, 417 (1981).
[143] *Wesby*, 138 S.Ct. at 588 (citing *United States v. Arvizu*, 534 U.S. 266, 277-278 (2002)).

State's open carry laws.  A seizure occurs only when a suspect's "freedom of movement" is terminated "through means intentionally applied" by the government actor."[144]   At all times relevant, Officers were required to obey the laws of the United States and the laws of the State of Texas.

Since January 1, 2016, Texas law has allowed a person with a current concealed handgun license or a person who obtains a new license to carry a handgun in a concealed manner or in the open as long as that weapon is secured in a belt or shoulder holster. In addition, Texas has long permitted a person to carry a long gun in public without any license.[145] Chief Valenciano recognized being aware of this in his March 26, 2018 call with Mr. Grisham.

On March 27, 2018, Plaintiffs had not committed and were not committing a crime in the state of Texas by openly carrying a long gun and openly displaying a holstered handgun. Defendants, therefore, did not give Plaintiffs a lawful order. Defendants did not have reasonable suspicion to detain Plaintiffs. Defendants did not have probable cause to arrest Plaintiffs. Furthermore, Plaintiffs did not "intentionally or knowingly" display a firearm. . . in a public place in a manner calculated to alarm," and therefore did not commit an offense under Texas Penal Code § 42.01(a)(8).[146] The statute "specifically includes a *mens rea* as it states the person must act *intentionally* or *knowingly*" when he displays his firearm in a public place, and his displaying of the firearm "must have been *calculated* to alarm."[147] The statute does not define "manner," "calculated," or "alarm." A Texas appellate court, in *Ex parte Poe*,[148] turned to the *Webster's*

---

[144] *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989).

[145] The Texas Open Carry statutes under the Texas Government Code Chapter 411 Subsection H became effective January 1, 2016 (HB 910).

[146] TEX. PENAL CODE 42.01(a)(8) provides: "A person commits an offense if he intentionally or knowingly displays a firearm . . . in a public place in a manner calculated to alarm."

[147] *Lovett v. State*, 523 S.W.3d 342, 347 (Tex. App.—Fort Worth 2017, pet. ref'd) (citing *Ex parte Poe*, 491 S.W.3d 348, 354 (Tex. App.— Beaumont 2016, pet. ref'd).

[148] *Ex parte Poe*, 491 S.W.3d 348 (Tex. App.— Beaumont 2016, pet. ref'd).

*Dictionary* for the "commonly known and accepted usage and meaning" of those words.[149] Accordingly, "manner" was defined as the "mode or method in which something is done or happens,"[150] "calculated" as "planned or contrived so as to accomplish a purpose or achieve an effect,"[151] and "alarm" as "fear or terror resulting from a sudden sense of danger[.]"[152]  Another Texas appellate court, in *Lovett v. Texas,*[153] asserted, "the mere presence of a firearm or deadly weapon in public cannot possibly supply the requisite *mens rea* . . . or else anyone participating in Texas's embrace of lawful open carry would be guilty the moment he stepped outside his home visibly armed."[154]

The "statute's requirements that the display of a firearm be done intentionally or knowingly and in a manner calculated to alarm, take the context of the actor's speech into question[.]"[155] In *Poe*, Grisham provided an affidavit as President and Founder of Open Carry Texas that "openly carrying [firearms] is immensely important as a [First] Amendment issue as it draws attention and encourages dialogue on our efforts. No single method of speech has been more successful for us than the open display of firearms in a peaceful and respectful manner[.]"[156] The *Lovett* court noted that "[t]his makes sense as a general proposition; if the activists alarmed the public, they would alienate that same public and potentially defeat their own cause."[157]

Defendants were aware of the individuals they encountered on March 27, 2018 in Olmos Park, were aware that as Second Amendment activists, Plaintiffs' intent was to "educate" not

---

[149] *Id.* at 354.
[150] *Id.* (citing *Webster's Third New Int'l Dictionary* 1276 (2002).
[151] *Id.* (citing *Webster's Third New Int'l Dictionary* 315 (2002).
[152] *Id.* (citing *Webster's Third New Int'l Dictionary* 48 (2002).
[153] *Lovett v. State*, 523 S.W.3d 342 (Tex. App.— Fort Worth, 2017, pet. ref'd).
[154] *Id.* at 348.
[155] *Poe*, 491 S.W.3d at 355.
[156] *Id.* at 351.
[157] *Lovett,* 523 S.W.3d at 347, n. 7.

"alarm" the public, and were aware that the manner in which they displayed their rifles and handguns was in a manner to accomplish that purpose.

According to the March 26, 2018, phone call between Grisham and Chief Valenciano, with respect to the "calculated-to-cause-alarm" elements: First, Chief Valenciano was aware of Plaintiff Grisham's identity; Second, that Plaintiff Grisham was a Second Amendment Rights activist; Third, that Second Amendment Rights activists were devoted to educating the police and public as to Texas' open carry laws; Fourth that Plaintiff was planning to attend a Second Amendment Rights gathering in Olmos Park to protest the City's Ordinance inconsistent with the State's Open Carry laws; and Fifth, that he intended to do so peacefully and did not want to be put on the ground or harmed for simply carrying a weapon. When Plaintiff asked Chief, "how do your guys deal with open carriers," Chief Valenciano told him "I'm telling you—general policy—Texas is an open carry state – provided that you have a license to carry a handgun and you're not committing any criminal activity you don't have anything to worry about."[158]

According to every video depicting the March 27, 2018, event, pertaining to the "calculated-to-cause alarm" elements:

(1)    Officers received information from dispatch that it was "the Second Amendment People." Olmos Park Police Department was aware of the possibility of protests due to prior interactions, social media posts, and their own safety bulletin acknowledging that protests would occur in the area.

(2)    Officers did not consider the situation dangerous, in that they did not prevent motorists, bicyclists, or pedestrians from passing by and even through the scene. A motorist even held a brief conversation with Grisham.

(3)    Plaintiffs were in active communication with Officers on the scene and informed them repeatedly that their purpose in being there was to protest the City's Ordinance inconsistent with the State's Open-Carry Laws. Everard made repeated statements that he was not there to hurt anyone. Grisham informed Officer Lopez early in the interaction that he had prior discussions with the Chief.

---

[158] Dkt. 79-26 (3:20-3:40).

(4)     Everard's long gun, which was strapped over his shoulder and resting on the front of his body with the gun pointed to the ground, never moved from that position, nor did he ever touch the gun.

(5)     Everard held a camera in his right hand with which he filmed the event as it was happening.

(6)     Even as Defendants were arresting Everard, they did not remove the rifle.

(7)     Grisham's handgun remained in its holster on his left side, and he never touched it.

(8)     Grisham held a camera in his left hand with which he filmed the event as it was happening.

(9)     Even as Defendants were arresting Grisham they did not take the handgun away.

(10)    Grisham's demeanor appeared designed not to alarm.  He stood on the corner and made no sudden movements, including no sudden movements toward his handgun.

(11)    Everard's demeanor appeared designed not to alarm.  He stood on the corner and made no sudden movements, including no sudden movements toward his long gun.

(12)     Both Plaintiffs continued to inform Officers on the scene they were not committing a crime, and they were there to educate police and the public as to Texas' Open-Carry laws and were not there to harm anyone.

(13)    When Chief Valenciano arrived, Plaintiffs reminded him that Grisham had called him the day before and informed him they meant no harm, they were just exercising their rights to open carry in Texas and protest the City's Ordinance inconsistent with those rights.

(14)    Everard did not act in a threatening manner.

(15)    Grisham did not act in a threatening manner.

In short, neither Grisham or Everard did anything that would qualify as "calculated" to cause "fear or terror resulting from a sudden sense of danger."[159]  Because Defendant Officers violated Plaintiffs clearly established constitutional right to be free from unlawful arrest they are not entitled to qualified immunity.

### 3.  Defendants clearly violated Plaintiffs' constitutional right to be free from abridgement of protected speech under the First Amendment.

---

[159] *Poe*, 491 S.W.3d at 354.

Plaintiffs' right to be present and engage in expressive conduct in a traditional public forum is a clearly established Constitutional right.[160] Fifth Circuit precedent and the robust consensus among circuit courts of appeals has established the constitutional right for a private citizen to assemble in a traditional public forum, engage in expressive conduct, record police officers performing their official duties, and to record that information for the purpose of conveying that information.[161] The First Amendment protects film as a medium and the act of filming, as "there is not [a] fixed First Amendment line between the act of creating speech and the speech itself."[162] "Moreover, filming of . . . police officers performing their responsibilities [in a public place] fits comfortably within basic First Amendment principles,"[163] as "such filming contributes to the public's ability to hold police accountable and ensures that officers are not abusing their power."[164]

Chief Valenciano and Officer Lopez knew (and other Defendants hearing the dispatch should have known) prior to arriving on the scene that the 9-1-1 calls pertained to "the Second Amendment people."[165] They had numerous interactions over the preceding weeks with open carry activists. Chief Valenciano even made a PowerPoint on this specific issue in light of recent protests, and then presented this information to local, state, and federal authorities.[166] Chief

---

[160] U.S. Const. amend I.

[161] *See Keenan v. Tejeda*, 290 F.3d 252, 259 (5th Cir. 2002) ("The First Amendment prohibits . . . adverse governmental actions against an individual in retaliation for the exercise of protected speech activities."); *Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 191-192 (5th Cir. 1988) ("The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department."). *See also* see *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595, 608 (7th Cir. 2012) (stating that making a recording "is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording."); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (finding, in a case involving citizens videotaping police, that "[t]he First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing, in case involving citizen filming police officers, a "First Amendment right to film matters of public interest.").

[162] *Turner*, 848 F.3d at 688-689 (quoting *Alvarez*, 679 F.3d at 596).

[163] *Id.*

[164] *Id.* at 690.

[165] Dkt. 79-16, 33:7-9; Dkt. 79-21, 185:11-16.

[166] Dkt. 44-2; Dkt. 65-7.

Valenciano and the Olmos Park City Manager were in constant communication with Alamo Heights concerning recent protests and interactions with open carry activists.[167]   Nonetheless, Defendants used a coordinated and concentrated effort to unlawfully restrain and abridge Plaintiff Grisham and Plaintiff Everard's First Amendment right. Defendants held at gunpoint, tased, shoved, and arrested Plaintiffs while they were exercising their First Amendment right to record officers on a public sidewalk, to protest their right to openly carry firearms, and to peacefully protest government action. Defendant Officers violated Plaintiffs' rights, protected under the First Amendment, and Fifth Circuit precedent to be present in a public form, gather with likeminded individuals, speak on a matter of public concern, and record, then convey police officers performing their official duties, and therefore, are not entitled to qualified immunity.

### 4. Defendants clearly violated Plaintiffs' constitutional right to be free from retaliatory action for engaging in protected speech under the First Amendment.

Defendants' conduct clearly violated Plaintiffs' First Amendment right to be free from retaliatory action for engaging in protected speech. "The First Amendment prohibits, not only direct limits on individual speech, but adverse governmental action against an individual in retaliation for exercise of protected speech activities."[168] "The right of every American to condemn police misconduct is indisputably protected under the First Amendment."[169]

At least as early as 2016, the Fifth Circuit held that individuals who protest are protected under the First Amendment from retaliatory actions by government officials.[170]  "The effect on freedom of speech may be small," the Court explained, "but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be

---

[167] Dkt. 74-1, pg 12, 16-28, 30, 46, 48-49, 51-56, 65-66, 71, 75, 83, 97, 100, 103.
[168] *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (citing *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999)).
[169] *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982).
[170] *Allen v. Cisneros*, 815 F.3d 239, 244 (5th Cir. 2016).

actionable."[171] Fifth Circuit precedent clearly establishes that it is a First Amendment violation if an officer retaliates against someone in response to protected speech.[172] "If government officials were permitted to impose serious penalties in retaliation for an individual's speech, then the government would be able to stymie or inhibit his exercise of rights in the future and thus obtain indirectly a result that it could not command directly."[173]

To establish a First Amendment retaliation claim, a plaintiff must show that (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiff's exercise of constitutionally protected conduct."[174]

Like the plaintiff in *Keenan v. Tejeda*,[175] Plaintiffs, here, were required to curtail their protected speech activities in response to Defendant Officers' actions. Plaintiffs have sufficiently averred that they were deprived of a constitutional right, even though they were not completely silenced. "A required showing of actual injury does not necessarily mean that plaintiffs must cease criticizing the government officials altogether in order to have a claim for retaliation."[176]

### 5. Defendants clearly violated Plaintiffs' constitutional right to be free from unlawful search and seizure under the Fourth Amendment.

Defendants clearly violated Plaintiffs' constitutional right under the Fourth Amendment to be free from unlawful search and seizure and are not entitled to qualified immunity. "Whether the

---

[171] *Keenan*, 290 F.3d at 258 (citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).
[172] *Id.* at 258 ("The First Amendment prohibits . . . adverse governmental action against an individual in retaliation for the exercise of protected speech activities."). *See also City of House. v. Hill*, 482 U.S. 451, 462 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.").
[173] *Colson v. Grohman*, 174 F.3d 498, 509-510 (5th Cir. 1999).
[174] *Keenan*, 290 F.3d at 258 (citing *Carroll v. Pfeffer*, 262 F.3d 847, 850 (8th Cir. 2001), *Smith v. Plati*, 258 F.3d 1167, 1176 (10th Cir 2001), and *Lucas v. Monroe County*, 203 F.3d 964, 973 (6th Cir. 2000)).
[175] *Keenan v. Tejeda*, 290 F.3d 252, 260 (5th Cir. 2002).
[176] *Id.* at 260.

force used to effect a particular seizure is "reasonable" for purposes of the Fourth Amendment requires a careful balancing of the intrusion upon the individual's interests with the countervailing governmental interests at stake."[177]  The court "must assess not only the need for force but also 'the relationship between the need and the amount of force used.'"[178]  "The timing, amount, and form of a suspect's resistance are key to determine whether the force used by an officer was appropriate or excessive."[179] "While 'a suspect's refusal to comply with instructions' may indicate that physical force is justified, officers must also select the '*degree* of force.'"[180] The Court has determined that "an officer must use force 'with measured and ascending actions that correspond[] to [a suspect's] escalating verbal and physical resistance'" to remain within constitutional bounds.[181]  "Therefore, force may be less justified or unjustified when a suspect engages in 'passive resistance,' as opposed to 'active resistance.'"[182] A determination of "[w]hether an official's conduct was objectively reasonable [in light of the law that was clearly established at the time of the disputed action] is a question of law for the court, not a matter of fact for the jury."[183] "Precedent involving similar facts can help move a case 'beyond the otherwise hazy border

---

[177] *Graham*, 490 U.S.at 396.

[178] *Joseph on Behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 323 (5th Cir. 2020) (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (2009) (per curiam)).

[179] *Id.* at 323 (2020) (quoting *Deville*, 567 F.3d at 167), accord *Curran v. Aleshire*, 800 F.3d 656, 661 (5th Cir. 2015) ("A suspect's active resistance is a key factor in the Fourth Amendment's 'objective reasonableness' test."); *See also Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.") (quoting *Lytle v. Bexar Cty.*, 560 F.3d 404, 413 (5th Cir. 2009)).

[180] *Bartlett*, 981 F.3d at 323 (2020) (citing *Deville*, 567 F.3d at 167-68).

[181] *Id.* at 323 (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012)).

[182] *Id.* (quoting *Deville*, 567 F.3d at 167) (concluding that officers unreasonably broke the driver's side window to extract a driver whose "resistance was, at most, passive in that she merely refused to leave her grandchild and exit the vehicle until [her husband] came to get the child."). *See also Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir 2017) (holding that "the law [as of January 2013] clearly established that it was objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp.") (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir 2000); *Hanks*, 853 F.3d at 743, 746) (concluding that "a blow to [the suspect's] upper back or neck was unreasonable when the suspect resisted only passively by not immediately obeying the officer's order to kneel")).

[183] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

between excessive and acceptable force'"[184] and in this instance in particular, on March 27, 2018, case law provided Officer Defendants notice that their use of force against Plaintiffs was unlawful.

### 6. Defendants clearly violated Plaintiffs' constitutional right to be free from state actors' failure to intervene under 42 U.S.C. § 1983.

Defendant Officers clearly violated Plaintiffs' constitutional rights under 42 U.S.C. § 1983 to be free from state actors' failure to take reasonable measures to protect them from another officer's use of excessive force at the scene.  It is established law that "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983."[185] A constitutional right is clearly established if "in light of pre-existing law the unlawfulness [of the alleged conduct] is apparent."[186]

To bring a failure to intervene claim, a plaintiff must show that (1) [officers] knew of a pattern of constitutional deprivations; (2) the abuse was caused by a state actor over whom they had supervisory authority or a state-law created right of legal control; (3) [officers'] failure to act demonstrated deliberate indifference to the victim's constitutional rights; and (4) their failure to act resulted in a constitutional injury."[187]  To succeed on a bystander liability claim, a plaintiff must demonstrate that the state actor (1) knew a fellow officer was violating his constitutional rights; (2) had a reasonable opportunity to prevent the harm; and (3) chooses not to act."[188]A failure to intervene claim is clearly established if "in light of pre-existing law the unlawfulness [of the alleged conduct] is apparent."[189]

The evidence in this case undisputedly shows each individual Defendant knew on March

---

[184] *Kisela v. Hughes*, — U.S. —, 138 S.Ct. 1148, 1152-1153, 200 L.Ed.2d 449 (2018).
[185] *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (citing *Harris v. Chanclor*, 537 F.2d 203, 205-206 (5th Cir 1976)).
[186] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).
[187] *Whitley v. Hanna*, 726 F.3d 631 (5th Cir. 2013).
[188] *Whitley*, 726 F.3d at 646.
[189] *Anderson*, 483 U.S. at 640.

27, 2018, that the Plaintiffs had a right to openly carry.[190] Defendants were not aware of any crime being committed.  With this knowledge, each Defendant had an opportunity to end the violations of Plaintiffs' constitutional rights at any point during the nearly eight-hour span that Defendants had Plaintiffs unlawfully detained and in custody. With this knowledge, Defendants, individually, either chose not to act or were coerced by Chief Valenciano to not step out of authoritative line and act. Emphatically, each Defendant knew of the grave Constitutional violations taking place on March 27, 2018 and made the decision to not act.

### 7. Defendants clearly violated Plaintiffs' constitutional right to be free from unlawful deprivation of property under the Fourteenth Amendment.

"The Fourteenth Amendment's due process clause has two components—(1) a guarantee of procedural protections when a state seeks to deprive an individual of protected liberty or property interests, and (2) a substantive protection against conduct that 'shocks the conscience.'"[191] Defendants clearly violated Plaintiffs' constitutional right to be free from unlawful deprivation of property when Defendant Officers on March 27, 2018 placed them under arrest without probable cause, confiscated their lawfully carried firearms, damaged Plaintiff Everard's camera by throwing it into the street, and deleted the SD cards from Plaintiffs' video cameras, GoPro, and cellphones.

"Deprivations of property caused by the misconduct of state officials do not infringe constitutional due process provided adequate state post-deprivation remedies exist."[192]  The City of Olmos Park has no adequate post deprivation remedy to restore the lawfully recorded speech on Plaintiffs SD cards, GoPro and cellphones, failed to replace Plaintiff Everard's damaged

---

[190] Dkt 79-9, 17:13-15; Dkt. 79-16, 9:24-10:2; Dkt. 79-21, 20:16-22; Dkt. 79-22, 15:2-13.

[191] *Estate of Macias v. Tex. Dep't of Adult Protective Servs.*, No. SA-20-CA-460-FB, 2021 U.S. Dist. LEXIS 126391, at *20-21 (W.D. Tex. Mar. 8, 2021) (citing *Jordan v. Fisher*, 823 F.3d 805, 810 (5th Cir. 2016)).

[192] *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996) (citing *Brooks v. George County, Miss.*, 84 F.3d 157, 165 (5th Cir. 1996)).

camera, and coerced Plaintiffs' into signing false property sheets at Taser point.[193] The time

Plaintiffs were deprived of lawfully carrying their firearms is irreplaceable. This is the sort of abuse

of power that shocks the conscience of the public entitling Plaintiffs to compensation pursuant to

their Fourteenth Amendment protections.[194]

### 8. Defendants clearly violated Plaintiffs' constitutional right to be free from the state's deliberate failure to render medical aid under the Fourteenth Amendment.

Defendant Officers were deliberately indifferent to the medical needs of the Plaintiffs in

violation of their Fourteenth Amendment rights.  "After the initial incidents of seizure have

concluded and an individual is being detained by police officials but has yet to be booked, an

arrestee's right to medical attention, like that of a pretrial detainee, derives from the Fourteenth

Amendment."[195]  "[T]he responsible government or governmental agency [is required] to provide

medical care to persons . . . who have been injured while being apprehended by the police."[196] An

officer violates an arrestee's constitutional right to medical care if he "acts with deliberate

indifference to a substantial risk of serious medical harm and resulting injuries."[197]  "Deliberate

indifference is a degree of culpability beyond mere negligence or even gross negligence; it must

amount to an intentional choice, nor merely an unintentionally negligent oversight."[198]

To establish a claim against a police officer for failing to provide reasonable medical care,

a plaintiff must show that: (1) "the official was aware of facts from which an inference of

---

[193] Dkt. 79-4; Dkt. 79.
[194] *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.").
[195] *Nerren v. Livingston Police Dep't*, 86 F.3d 469, 473 (5th Cir. 1998) ("[O]nce an arrest is complete, pretrial detainees are protected by the due process clause of the Fifth or Fourteenth Amendments").
[196] *Mason v. Lafayette City-Par.Consol. Gov't*, 806 F.3d 268, 279 (5th Cir. 2015).
[197] *Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011) (quoting *Mace v. City of Palestine*, 333 F.3d 621, 625 (5th Cir. 2003)).
[198] *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992).

substantial risk of serious harm could be drawn;" (2) "the official actually drew that inference;" and (3) "the official's response indicates the official subjectively intended that harm occur."[199]

A reasonable person in the Defendants' position would have known Plaintiff Grisham was in need of medical assistance after Chief Valenciano used excessive force on Grisham by tasing him in the back, thus causing him to violently fall back and smack his skull on the concrete.[200] Defendants observed Grisham bleeding from his head but made no effort to treat his head injury or remove the probes from his back.[201]

The training manual for the department issued taser Chief Valenciano was using, which all of the Defendants affirmed they were generally familiar with, explicitly states the electrified probes are to be removed on scene.[202] Knowing this, Defendants chose to drag Grisham to a patrol car with the probe cartridge dragging across the asphalt, causing further pain.[203] Officer Lopez and Viera then placed Grisham in a patrol car on his back thereby increasing the excruciating pain of the probes lodging deeper into his depressed skin.[204] The Defendants did not remove the probes at the scene and further intentionally waived off any medical personnel from coming to the scene.[205] By the time medical personnel were able to treat Grisham, they determined the probes were too deep, so he had to be treated at a hospital.[206] Defendants' failure to provide medical care or access to medical care is in direct violation of the Fourteenth Amendment.

      **9.  Defendants clearly violated Plaintiffs' constitutional right to be free from malicious prosecution; and to be free from a municipality's deprivation of guaranteed constitutional rights under color of state law.**

---

[199] *Thompson v. Upshur Cty., TX*, 245 F.3d 447, 458-459 (5th Cir. 2001) (citing *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 643, 649-650 (5th Cir. 1996)).
[200] Dkt. 79-10. (5:00-8:00).
[201] *Id.*
[202] Exhibit B, (pg. 7).
[203] Dkt. 79-10, (7:07-8:00).
[204] *Id.*; 79-20, (8:10-8:45); 79-13, (7:35-8:00).
[205] Dkt. 74-1, pg 13; Dkt. 79-21, 165:1-21.
[206] Dkt 79-13, (20:30-22:30).

To establish a viable 42 U.S.C. § 1983 claim based on malicious prosecution Plaintiff must "allege that officials violated specific constitutional rights in connection with a 'malicious prosecution.'"[207]  "[F]acts amounting to malicious prosecution are properly alleged as part of an actual . . .  claim [that constitutional rights have been violated], such as unreasonable search or seizure [under the Fourth Amendment]."[208]  Defendant Officers, thus, violated Plaintiffs' constitutional right to be free from malicious prosecution in their clear violation of plaintiffs' constitutional rights, as discussed above. As heretofore explained, Officers clearly violated plaintiff's constitutional right to (1) be free from excessive force under the Fourth Amendment; (2) to be free from unlawful arrest under the Fourth Amendment; (3) to be free from abridgement of protected speech under the First Amendment; (4) to be free from retaliatory actions for engaging in protected speech under the First Amendment;  (5) to be free from unlawful search and seizure under the Fourth Amendment; (6) to be free from the state's deliberate indifference to guaranteed constitutional rights under 42 U.S.C. § 1983; (7) to be free from unlawful deprivation of property under the Fourteenth Amendment; (8) to be free from the state's deliberate failure to render medical aid under the Fourteenth Amendment; (9) to be free from malicious prosecution; and (10) to be free from a municipality's deprivation of guaranteed constitutional rights under color of state law.

### 10. Defendants clearly violated Plaintiffs' constitutional right to be free from a municipality's deprivation of guaranteed constitutional rights under color of law.

Plaintiffs have stated a plausible claim against Olmos Park Police Department for its policy, practice, or custom to deprive Plaintiffs and other open carry activists of their guaranteed

---

[207] *Cuadro v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (quoting *Castellano v. Fragozo*, 352 F.3d 939, 945 (5th Cir. 2003) (en banc)).
[208] *Arnold v. Williams*, 979 F.3d 262, 270 (5th Cir. 2020).

First Amendment rights. It is well established that under 42 U.S.C. § 1983 "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, shall be liable to the party injured."[209] Municipalities, including counties and cities, are "persons" within the meaning of § 1983,[210] and may be liable under § 1983 "if the execution of one of its customs, or policies deprives a plaintiff of his or her constitutional rights."[211] Municipalities, however, are liable only for their own acts and not those attributed to them by principles of respondeat superior.[212] To state a claim, a plaintiff must allege facts that show "(1) that he has been deprived of a right secured by the Constitution and the laws of the United States, and (2) the deprivation occurred under color of state law."[213] Under Supreme Court and Fifth Circuit precedents, municipal liability under § 1983 requires proof of three elements: "a policy maker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."[214]

Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."[215] "The description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts."[216] A single violent incident is "insufficient to hold a municipality liable . . . the plaintiff must demonstrate "at

---

[209]  42 U.S.C. § 1983.
[210]  *Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
[211]  *Id.* at 690-91.
[212]  *Id.* at 691-692.
[213]  *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *Cornish v. Corr. Servs., Corp.*, 402 F.3d 545, 549 (5th Cir. 2005).
[214]  *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell,* 436 U.S. at 694; see also *Valle v. City of Houston*, 613 F.3d 536, 541-542 (5th Cir. 2010).
[215]  *Monell,* 436 U.S. at 691-695.
[216]  *Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992); accord *Piotrowski,* 237 F.3d at 578-579.

least a pattern of similar incidents in which citizens were injured . . . to establish the official policy requisite to municipal liability under section § 1983."[217]

Defendant Chief Valenciano was an official policy maker for the City of Olmos Park Police Department on March 27, 2018.[218] Chief Valenciano was responsible for setting up all police department policies (including for use of force and de-escalation).[219] Chief Valenciano also signed these policies as the "approving authority"[220] Chief Valenciano was also principally responsible for training officers on law enforcement policies and procedures.[221] The City did not oversee the training or require any updates or reports concerning the implementation and training of Olmos Park law enforcement policies and procedures.[222] Chief Valenciano appears to be the policy maker for other policies, customs, and practices relating to the police department. For example, he was the decision maker for contracts related to outsourced emergency dispatch services.[223]

The specific policy at issue was Defendant Chief's "quash the rebel" policy, custom, and practice, which resulted in the unlawful arrest and detention of open-carry protestors. A policy to arrest individuals for false reasons, like, in response to protected conduct, is unconstitutional.[224] Defendant Chief Valenciano's department had an immediate history of arresting individuals for exercising their right to protest a city ordinance that Second Amendment activists thought were

---

[217] *Snyder v. Trepagnier*, 142 F.3d 791, 798-799 (5th Cir. 1998) (citing *Rodriguez v. Avita*, 871 F.2d 552, 554-555 (5th Cir. 1989)).
[218] Dkt. 74-1, pg 33, 37, 46; Exhibit C**.**
[219] *Id.*
[220] *Id.*
[221] Exhibit D, 17:25-18:3.
[222] *Id.,*18:10-22.
[223] Dkt. 74-1, pg 106-109.
[224] *James v. Harris County,* 577 F.3d 612, 617 (5th Cir. 2009).

unconstitutional and inconsistent with state law.[225]   Olmos Park's City Manager published bulletins confirming and supporting the arrests of activists despite knowing that it was lawful to openly carry firearms.[226]

### C. Defendants' No Waiver of Immunity is Inapplicable

Defendants' have moved for summary judgment, with respect to the Texas Tort Claims Act, on Plaintiffs' malicious prosecution claim.[227] "Texas courts have held that the negligent implementation of a policy at the operational level can give rise to such a claim under some provision of Section 101.021 of the Texas Civil Practice and Remedies Code."[228] Defendants were involved in at least a negligent implementation of a policy that resulted in them huddling together to hunt for charges to justify the arrest of Plaintiffs while Plaintiffs were shackled and detained in a jail cell.  This, at minimum, negligent act, with Defendant Ruiz as the individual responsible officer forwarding the charges to the Bexar County district attorney, is not immune to the Texas Tort Claims act.

### V. CONCLUSION AND PRAYER

Plaintiffs have sufficiently shown that Defendants are not entitled to qualified immunity, that there are no genuine issue of material fact entitling Defendants to summary judgment. Therefore, Defendants' motion should be denied in its entirety.

Respectfully Submitted,

**GRABLE GRIMSHAW MORA PLLC**

*/s/ Brandon J. Grable*
**BRANDON J. GRABLE**

---

[225] Dkt. 79-2; 79-4; https://www.youtube.com/watch?v=FxgaYsh0cQA. (0:44-1:20); https://www.youtube.com/watch?v=rUGrQtExsgs (1:30-6:20); https://www.youtube.com/watch?v=rUGrQtExsgs; https://www.youtube.com/watch?v=RzkaLIYzB6A&t=11s (1:06-3:08) (6:20-20:41).
[226] Dkt. 74-1, pg 16-25.
[227] Dkt. 81, ¶ 47.
[228] *Watson v. Bexar Cty.*, No. SA-02-CV-646-RF, 2004 U.S. Dist. LEXIS 10842, at *9 (W.D. Tex. Apr. 8, 2004).

Texas State Bar No. 24086983
brandon@ggm.law
**AUSTIN M. REYNA**
Texas State Bar No. 24118645
austin@ggm.law
1603 Babcock Road, Suite 280
San Antonio, Texas 78229
Telephone: (210) 963-5297
Facsimile: (210) 641-3332
**COUNSEL FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby affirm that on this 22nd day of November 2021, that the foregoing document was filed with the Court's CM/ECF electronic filing system, and that a copy of said document was served upon all parties of record, via electronic service.

*/s/ Brandon J. Grable*