UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CHRISTOPHER GRISHAM and JAMES EVERARD, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | SA-20-CV-387-OLG (HJB) |
| CITY OF OLOMOS PARK, RENE VALENCIANO, J. LOPEZ, HECTOR RUIZ, and A. VIERA, in their individual capacities, | § § § § § | |
| Defendants. | § § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable Orlando L. Garcia, United States Chief District Judge:**

This Report and Recommendation concerns the cross motions for summary judgment filed by the Plaintiffs and Defendants in this case. (Docket Entries 81 and 82.)  Pretrial motions in this case have been referred to the undersigned for consideration. (*See* Text Orders dated January 31, 2022.)  For the reasons set out below, I recommend that Defendants' Motion for Summary Judgment (Docket Entry 81) be **GRANTED** and Plaintiffs' Motion for Partial Summary Judgment (Docket Entry 82) be **DENIED**.

**I.      Jurisdiction.**

Plaintiff brought suit alleging violations of 42 U.S.C. § 1983.  This Court has federal question jurisdiction under 28 U.S.C. § 1331.  (Docket Entry 1.)  I have authority to issue this Report and Recommendation pursuant to 28 U.S.C. § 636(b).

## II.    Background.

This case arises out of the arrests of Plaintiffs, among a group of self-styled "Second Amendment protestors," in the City of Olmos Park, Texas ("the City"), on March 27, 2018.[1]   On that date, 911 operators received calls regarding a man "with an AK-47" around his neck, standing on a busy street corner in Olmos Park for about five minutes. (Docket Entry 82-5, at 0:00–0:45.) Officers were dispatched to the scene to investigate, with the idea that they would encounter "those Second Amendment people again." (Docket Entry 82-6, at 0:55–1:05.)  The intersection where Plaintiffs were gathered was a busy one, with both pedestrian and vehicle traffic. (Docket Entry 82-9.)

When the officers arrived, they encountered Plaintiff James Everard standing on a street corner with a large gun in a holster in front of his chest. (Docket Entry 82-9, at 0:15.)  Defendant J. Lopez parked his vehicle several feet away from Everard, exited the vehicle, and stood behind his car's open door asking Everard questions about his weapon and intentions.  (*Id.* at 0:15–0:44.) The officer repeatedly told Everard to remove his gun and get on the ground.  (*Id.* at 0:44–1:58.) Everard did not comply with those commands, questioning why he should have to comply.  (*Id.*) When instructed to get on the ground another time, Everard responded "you lay down on the ground, motherfucker! You lay down on the ground, asshole." (*Id.* at 1:55–1:58.)

Other officers arrived and continued verbal negotiations with Everard. (Docket Entry 82-9, at 1:18–2:26.)  At this point, Plaintiff Christopher Grisham approached; he was also armed, with a handgun in a holster on his hip, and was filming the interaction with the officers.  (*Id.* at 2:26.)

---

[1] The parties have presented a number of audio and video recordings of the incidents involved, including a video recording made by Plaintiff Grisham himself during the incident. (*See* Docket Entries 82-5, 82-6, 82-9, &82-12.) References to these recordings include time stamps, where applicable.

The officers instructed Grisham to get away from Everard, but he did not comply and continued to approach. (*Id.* at 2:36.) The officers continued to exchange words with Plaintiffs; they asked Plaintiffs about their intentions with their weapons, and Plaintiffs taunted Defendants about "getting an education" and "losing [their] qualified immunity," swearing at the officers and complaining that Defendants were holding them at gun point. (*Id.* at 2:36– 5:25.)

Olmos Park Police Chief Rene Valenciano then appeared on the scene and approached Plaintiffs, with one hand on his taser. (Docket Entry 82-9, at 5:25.) Like the other officers, he told Everard to get on the ground; again, Everard refused to comply. (*Id.* at 5:25–5:40.) Defendant Officer A. Viera also approached and once again instructed Grisham to get away from Everard, which Grisham refused to do. (*Id.* at 5:35–4:45.) Viera approached to remove Grisham, with his handcuffs out; Grisham backed away several feet. (*Id.* at 5:45–5:48.) Viera reached for Grisham's hands to place him in handcuffs, but Grisham pulled them away, continuing to retreat from the officer. (*Id.* at 5:47–5:53.) Grisham turned away and backed up in the direction of Everard, continuing to pull away from the officer. (*Id.*) At this point, Chief Valenciano ran behind Grisham and tased him, causing him to fall backwards and hit his head on the pavement. (*Id.* at 5:52–5:55.)

Meanwhile, another officer, Defendant Sergeant Hector Ruiz, approached Everard, who put his hands behind his back to be handcuffed. (Docket Entry 82-9, at 6:00–6:07.) Ruiz then walked Everard a few steps away from the road and, with one hand on his arm and another on his upper back, forced him onto his knees in a manner that was slow and controlled. (*Id.* at 6:07–6:23.) Defendant Valenciano then came over and both officers grasped Everard's arms and moved him from his knees to a prone position. (*Id.* at 6:23–6:40.)

Officers then turned Grisham over on his front, placed him in handcuffs, and searched him. (Docket Entry 82-9, at 6:07–7:07.) The officers picked Grisham up by his arms and the cuff of his

3

pants to carry across the street to the vehicle. (*Id.* at 7:07–7:23.) While being carried, Grisham

joked that "[he's] Superman." (*Id.*) Defendants then placed Grisham in the vehicle and drove him

to the police station, where he received medical treatment. (Docket Entry 82-12, at 8:40–18:55.)

During this time, Grisham remained alert and communicative with the officers. (*Id.*)

During the entire interaction described above, Plaintiffs were surrounded by other

protesters, who were likewise armed and who were filming the encounter.[2] (*See* Docket Entry 82-

12, at 0:00–11:20.) After Plaintiffs were arrested, another officer drove up to the scene. (Docket

Entry 82-9, at 10:50.) The remaining crowd begins yelling and pointing at Chief Valenciano and

the other defendant officers; one of the crowd members told the new officer that "I need you to

arrest them or we will. Or, I don't know who will but somebody will." (*Id.* at 11:10–11:18.)

Based on the above incident, Plaintiffs brought this §1983 lawsuit suit against the City and

the Defendant officers in their individual capacities, seeking damages. (Docket Entry 1.) The

parties have filed cross motions for summary judgment. (Docket Entries 81 & 82.)

### III.    Applicable Legal Standards.

#### A. *Summary Judgment.*

A party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if the

record shows no genuine issue as to any material fact exists and the movant is entitled to judgment

as a matter of law. FED. R. CIV. P. 56(c). A party against whom summary judgment is sought may

not rest on the allegations or denials in his pleadings, but instead must come forward with sufficient

evidence to demonstrate a "genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). A dispute concerning a material fact is "genuine," and therefore sufficient to

overcome a summary judgment motion, "if the evidence is such that a reasonable jury could return

---

[2] Others in the crowd were arrested, but they have not joined in this lawsuit.

a verdict for the nonmoving party." *Id.* The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted). "Although the evidence is viewed in the light most favorable to the nonmoving party, a nonmovant may not rely on 'conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence' to create a genuine issue of material fact sufficient to survive summary judgment." *Barrera v. MTC, Inc.*, No. SA-10-CV-665-XR, 2012 WL 1202296, at *2 (W.D. Tex. Apr. 10, 2012) (quoting *Freeman v. Tex. Dep't of Crim. Just.*, 369 F.3d 854, 860 (5th Cir. 2004)). When the parties submit video evidence, the Court "assign[s] greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Carnaby v. City of Houston.*, 636 F.3d 183, 187 (5th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372 (2007)).

**B.** *Qualified Immunity.*

The doctrine of qualified immunity protects public officials from suit and liability for damages under § 1983 unless their conduct violates a clearly established constitutional right. *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003). In determining whether the doctrine applies, courts engage in a two-step analysis, determining (1) whether a statutory or constitutional

right was violated on the facts alleged, and (2) whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.* at 623–24. The two steps of the qualified immunity inquiry may be performed in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Under the second step of the inquiry, "[a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Court does not need "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* Clearly established law is not determined "at a high level of generality." *Id.* at 742. Instead, the dispositive question is "whether the violative nature of particular conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted)). The inquiry must look at the specific context of the case. *Id.*

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). Although nominally an affirmative defense, the plaintiff has the burden to negate the defense once it is properly raised. *Garza v. Briones*, 943 F.3d 740, 744 (5th Cir. 2019). The plaintiff has the burden to point out clearly established law. *Clarkston v. White*, 943 F.3d 988, 993 (5th Cir. 2019). The plaintiff also bears the burden of "raising a fact issue as to its violation." *Delaughter v. Woodall*, 909 F.3d 130, 139 (5th Cir. 2018). Thus, once the defense is invoked, "[t]he plaintiff must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct"

according to that law. *Gates v. Texas Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 419 (5th Cir. 2008).

Even in in the qualified immunity context, however, all inferences are still drawn in the plaintiff's favor at the summary judgment stage. *Brown,* 623 F.3d at 253. This is true "even when . . . a court decides only the clearly-established prong of the [qualified immunity] standard." *Tolan v. Cotton,* 572 U.S. 650, 657 (2014). Likewise, "under either [qualified immunity] prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 656. "Accordingly, courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.* at 657; *cf., Tarver v. City of Edna*, 410 F.3d 745, 754 (5th Cir. 2005) (dismissal at summary judgment phase inappropriate because determining whether officer's conduct was objectively unreasonable in light of clearly established law required factfinding and credibility assessments).[3]

## IV.   Analysis.

As noted above, Plaintiffs assert § 1983 claims against the individual Defendant officers under on the First Amendment, the Fourth Amendment, and the Fourteenth Amendment Due Process Clause. They also raise claims for bystander liability against these officers, as well as policy-based liability against the City. This Report and Recommendation considers Plaintiffs' claims in the following order: (a) Fourth Amendment claims; (b) First Amendment claims; (c) Due Process claims; and (d) other claims to liability.

---

[3] Further qualified immunity precedent is discussed in the context of particular claims, as set out below.

7

A. ***Plaintiffs' Fourth Amendment Claims.***

Against the officers, Plaintiffs assert the following Fourth Amendment claims: (1) excessive force; (2) unlawful arrest; (3) unlawful search and seizure; and (4) malicious prosecution. Each is discussed in turn below.

1. *Excessive Force.*

Both Plaintiffs assert Fourth Amendment excessive force claims. (Docket Entry 1, at 11–12.) "To prevail on an excessive force claim, [a plaintiff] must show '(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (quoting *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012) and *Collier v. Montgomery*, 569 F.3d 214, 218 (5th Cir. 2009)).

Determining whether the force used to carry out a particular seizure is reasonable requires a careful balancing of the intrusion upon the individual's interests with the countervailing governmental interests at stake. *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The "calculus of reasonableness" must allow for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Whether the use of force is objectively unreasonable is a fact sensitive inquiry that turns on the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Additional considerations that "may bear on the reasonableness or

8

unreasonableness of the force used [include]: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

In excessive force cases, "[t]he second prong of the [qualified immunity] analysis 'is [itself] better understood as [encompassing] two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law.'" *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (quoting *Felton v. Polles*, 315 F.3d 470, 477 (5th Cir. 2002)). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Tarver*, 410 F.3d at 750.

"[S]pecificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018) (quoting *Mullenix*, 577 U.S. at 12). "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Id.* at 1153 (internal quotation marks

omitted). "Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers . . ., but in the light of pre-existing law, the unlawfulness must be apparent." *White v. Pauly*, 580 U.S. 548, 552 (2017) (internal quotation marks omitted). Thus, the "general rules" set forth by Supreme Court precedent "do not by themselves create clearly established law outside 'an obvious case.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

Sufficiently specific "[p]recedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful." *Kisela*, 138 S. Ct. at 1153 (internal quotation marks omitted). Otherwise, "qualified immunity protects actions in the hazy border between excessive and acceptable force." *Mullenix*, 577 U.S. at 18 (internal quotation marks omitted). Thus, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *al-Kidd*, 563 U.S. at 743. It likewise "shields an officer from suit when [the officer] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [the officer] confronted." *Brosseau*, 543 U.S. at 198; *see also Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."). In short, "[w]hen properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).

With this legal background in mind, the undersigned turns to the individual circumstances of each of the Plaintiffs' claims.

a.    Plaintiff Grisham's Claim.

Defendants move for summary judgment on Grisham's excessive force claim.  (Docket Entry 81, at 12–17.)  The force at issue in Grisham's claim is Defendant Valenciano's use of a taser. (Docket Entry 1, at 11–12.)  Grisham argues that this tasing constituted excessive force because the crimes he was arrested for were not severe, he was not an immediate safety threat, and he was not resisting arrest or attempting to flee. (Docket Entry 86, at 18–21.)

Considering the totality of the circumstances, Grisham's arguments clearly fail.  The confrontation at issue began not with Grisham, but with Plaintiff Everard standing on a street corner with his weapon, refusing to lower it despite the requests of other Defendant officers. (Docket Entry 82-9, at 0:00–2:25.)  Grisham, visibly carrying a weapon, inserted himself into the confrontation and approached Everard.  (*Id.*, at 2:25.)  Defendant Viera told Grisham to remain separate from Everard, but Grisham refused.  (*Id.* at 2:37.)  Defendants continued verbal negotiations with the Plaintiffs for about three minutes, attempting to get them to put down their weapons and get on their knees. (*Id.* at 2:37–5:24.)  Eventually, an officer approached the Plaintiffs to separate them.  (*Id.* at 5:24.)  When Plaintiffs still refused to comply, Viera joined and approached Grisham with his handcuffs out, attempting to separate Plaintiffs.  (*Id.* at 5:37.)  Grisham backed away several feet, still filming with one hand; his other hand started crossed across his chest, near the handle of his gun, before he lowered it to continue backing away from Viera. (*Id.* at 5:37–5:50.)  Viera again attempted to put handcuffs on Grisham, but he continued to back away, tugging his arms away from the officer and yelling.  (*Id.*)  All the while, he still had access to his gun.  (*Id.*)  Given these circumstances, it was not unreasonable for Chief Valenciano to believe, at the time he deployed the taser, that Grisham was both a safety threat and resisting arrest.

Grisham relies on *Hanks v. Rogers* for the proposition that "clearly established law [at the time of his arrest] demonstrated that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation." 853 F.3d 738, 747 (5th Cir. 2017).

*Hanks* is not sufficiently applicable to set "clearly established" law in this case. In *Hanks*, the violation at issue was merely a traffic violation. *Id.* at 745. During the encounter with the officer, Hanks stood facing away, displaying his empty hands either on the trunk of his car behind his back, or behind his head, depending on the officer's instructions. At most, he took a "small lateral step with his left foot" during the encounter. *Id.* at 745–46. The officer then rushed towards Hanks and administered a "half spear" blow to Hanks's upper back or neck, knocking him onto the trunk of his vehicle. *Id.* at 743.

In this case, by contrast, the officers did not abruptly resort to overwhelming physical force with Grisham while he was engaging in passive resistance on an otherwise minor offense. The violations at issue are not mere traffic violations, but rather weapons-related offenses, including two Class B misdemeanors, one Class A misdemeanor, and one felony. (Docket Entry 86, at 17–18.) Moreover, Grisham was engaged in more than the mere "passive resistance"; unlike Hanks, Grisham did not put his hands behind his back when ordered, but instead kept them within reaching distance of his handgun. (Docket Entry 82-9, at 5:37–5:50.) Instead of taking a mere half step with a single foot, Grisham backed away several feet when approached by Officer Viera. (*Id.*) Grisham did not keep hands still behind his back, but rather tugged them out of Viera's grasp. (*Id.*) And Grisham did all this while the officers were engaged with another armed suspect, with whom

12

they had engaged in verbal negotiations for more than five minutes. (Docket Entry 82-9, at 0:00–5:00.) Given these significant factual distinctions, *Hanks* is not precedent that "squarely governs the specific facts at issue" in this case. *Kisela*, 138 S. Ct. at 1152–53.

For all these reasons, Defendant Valenciano did not use excessive force when he tased Grisham. Moreover, even if Valenciano had committed a constitutional violation, Grisham has not introduced any precedent which would clearly establish such a violation. Summary judgment should be therefore granted on Grisham's excessive force claim.

b.    Plaintiff Everard's Claim.

The parties both seek summary judgment as to Everard's excessive force claim. (Docket Entry 81, at 14–17; Docket Entry 82, at 13–17.) Everard claims that Defendants Ruiz and Valenciano used excessive force when they "shoved [him] face first into the ashy gravel pavement." (Docket Entry 82, at 14.)

The video evidence does not support the claimed used of force. After Grisham was tased, Everard complied with the officers, placing his hands behind his back to be handcuffed. (Docket Entry 82-9, at 6:00–6:07.) Defendant Ruiz then walked Everard a few steps away from the road and, with one hand on his arm and another on his upper back, helped him onto his knees in a manner that was slow and controlled. (*Id.* at 6:07–6:23.) Then, Defendant Valenciano came over and both of them grasped Everard's arms and moved him from his knees to a prone position. (*Id.* at 6:23–6:40.) A review of the video evidence reveals that he was not pushed or shoved forcefully, but rather placed on the ground. (*Id.*) Moreover, at the time, Everard's hands were handcuffed behind his back, and he would not have been able to lay down on his front in a controlled manner without assistance.

13

Relying on *Ramirez v. Martinez*, 716 F.3d 369 (5th Cir. 2013), Everard argues that these actions were an excessive use of force because he was complying, in handcuffs, and did not pose a threat to the officers. (Docket Entry 82, at 16.) In *Ramirez*, the Fifth Circuit held that the use of a taser to subdue the plaintiff while he was handcuffed and lying face down on the ground constituted excessive force. *Id.* at 378–79. In this case, however, Defendants did not tase Everard, but merely moved him from a kneeling to a prone position. (Docket Entry 82-9, at 6:23–6:38.) Moreover, Defendants did not employ any force once he was already laying down, unlike the officers in *Ramirez*; Defendants did not move Everard to subdue him, but merely to effectuate a more thorough search for additional weaponry. (*Id.*, at 6:38–7:00.) *Ramirez* is inapposite.

Defendants Ruiz and Valenciano did not push, shove, kick, or tase Everard while he was on his knees; video reveals that they kept their hands on his person for the entirety of his descent. (Docket Entry 82-9, at 6:38–6:40.) Everard has not introduced evidence creating a genuine issue as to whether this method constituted force, much less whether such force was unreasonably excessive under the circumstances. And even if this behavior somehow constituted excessive force, Everard has not pointed to precedent which would clearly establish that it violated the Fourth Amendment. Summary judgment should therefore also be granted on Plaintiff Everard's excessive force claim.

### 2. *Unlawful Arrest.*

Both Plaintiffs assert that they were unlawfully arrested in violation of the Fourth Amendment. (Docket Entry 1, at 13.) The right to be free from warrantless arrest without probable cause is clearly established. *See, e.g.*, *Alexander v. City of Round Rock*, 854 F.3d 298, 306–07 (5th Cir. 2017). An officer is therefore not entitled to qualified immunity if "'there was no actual probable cause for the arrest' and he was 'objectively unreasonable in believing there was probable

cause for the arrest.'" *Rountree v. Dyson*, 892 F.3d 681, 685 (5th Cir. 2018) (quoting *Davidson v. City of Stafford*, 848 F.3d 384, 391 (5th Cir. 2017)). "Probable cause exists 'when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.'" *Haggerty v. Tex. Southern Univ.*, 391 F.3d 653, 655–56 (5th Cir. 2004) (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001)).

Whether there was probable cause requires identification and analysis of the particular crime at issue. Here, Plaintiffs were arrested and eventually charged with interference with the public duties of a police officer, obstructing a passageway or roadway, and resisting arrest; Everard was also charged with disorderly conduct—display of a firearm, and Grisham was charged with assault of a public servant. (Docket Entry 82-16, at 6.) A sufficient showing of probable cause as to any of the alleged offenses necessarily undermines any assertion of unlawful arrest. *Hunter v. City of Houston*, 564 F. Supp. 3d 517, 527 (S.D. Tex. 2021), *appeal dismissed sub nom. Hunter v. City of Houston, Texas*, No. 21-20632, 2022 WL 1782610 (5th Cir. Mar. 21, 2022).

Since the potential grounds for arrest for each Plaintiff differ slightly, this Report and Recommendation separately addresses each of the Plaintiffs' claims.

a.      Plaintiff Everard's Arrest.

Texas Penal Code § 42.01(a) provides: "A person commits an offense if he intentionally or knowingly displays a firearm or other deadly weapon in a public place in a manner calculated to alarm." TEXAS PENAL CODE § 42.01(a)(8) (West 2015). Defendants had probable cause to believe that Everard was committing this offense at the time of his arrest.

Defendants arrived on the scene after receiving calls from citizens that an armed man was standing on a busy street corner for a significant amount of time. (Docket Entry 82-5.) Video

15

evidence reveals that the street in question was on was a heavily trafficked area, with a gas station on one side and many commercial retailers on the other. (Docket Entry 82-9, at 0:44–1:58.) The area was populated with people both on foot and in cars. (*Id.*)  When Defendants arrived at the scene, Everard was present and visibly armed; they instructed Everard to get down the ground over ten times, but Everard refused. (*Id.*)  More than mere refusal, Everard began to yell back and swear at Defendants, while still in possession of his weapon. (*Id.*)  Everard was armed, belligerent, and noncompliant. (*Id.*)

There is little precedent that squarely addresses the issue of either reasonable suspicion or probable cause in the context of open carry.  Both parties, however, point to the case of *Ex parte Poe*, 491 S.W.3d 348 (Tex. App.—Beaumont 2016, *pet ref'd*).  The facts in *Poe* are substantially similar to those in this case: the defendant was walking through a crowded mall, his place of employment, with a rifle across his back, carrying a bag of food in one hand and a drink in the other. *Id.* 352.  He was not pointing his rifle at anyone or anything, and, in fact, did not even have it in his hands; nevertheless, mall patrons and store workers were "horrified" and called 911. *Id.* at 351.  When the defendant was approached by police following these calls, he "immediately became belligerent with the officers while espousing his Second Amendment rights," arguing that he was displaying his rifle for the purpose of a Second Amendment protest. *Id.*

The defendant sought habeas relief on the grounds that Texas Penal Code § 42.01(a)(8) was constitutionally overbroad and vague. *Ex parte Poe*, 491 S.W.3d at 352.  The appeals court held that the statute was not unconstitutional and that, while "there clearly are constitutional rights to bear arms and to express oneself freely, there is no constitutionally protected right to display a firearm in a public place *in a manner that is calculated to alarm*." *Id.* at 354–55 (emphasis in original).  It also held that the terms "manner," calculated," and "alarm," should be given their

commonly known and accepted meanings. *Id.* The Texas Court of Criminal Appeals has held that "a manner calculated to alarm" means a manner that is objectively likely to frighten an ordinary, reasonable person. *State v. Ross*, 573 S.W.3d 817, 824 (Tex. Crim. App. 2019).

In this case, Everard was standing in a crowded public area with his gun in a holster across his chest, which alarmed passersby enough to call 911. (Docket Entry 82-9, at 0:44–1:58.) He was loud and belligerent with Defendants when they attempted to ask him questions, have him put down his weapon, and inquire as to whether he was licenced to carry a weapon. (*Id.*) These facts and circumstances within Defendants' knowledge would have been sufficient for a reasonable person to conclude that Everard was displaying a firearm in a manner calculated to alarm. This reasonable conclusion gave the officers probable cause to arrest. *Haggerty*, 391 F.3d at 655–56.

In any event, the arresting officers are protected by qualified immunity, as Everard can point to no clearly established law that a reasonable officer would not have probable cause to arrest an armed, belligerent, noncompliant person under Texas Penal Code § 42.01(a)(8) in the circumstances of this case. To the contrary, case law indicates that Texas police officers in nearly identical circumstances *have* believed there was probable cause to effectuate such arrests, and such decisions have not been struck down by the Texas court. *See, e.g.*, *Ex parte Poe*, 491 S.W.3d at 352. Therefore, Defendants have not violated Everard's rights under the Fourth Amendment and, even if they had, such violation was not clearly established so as to overcome the immunity defense. Summary judgment should be granted on Everard's Fourth Amendment unlawful arrest claim.

b.    Plaintiff Grisham's Arrest.

Texas Penal Code § 38.15(a) provides that an individual person commits an offense if, with criminal negligence, the individual "interrupts, disrupts, impedes, or otherwise interferes with . . . a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." *Id.* TEXAS PENAL CODE § 38.15(a)(1) (West 2015). Defendants had probable cause to believe that Plaintiff Grisham had committed this offense.

As discussed above, Defendants were attempting to carry out a lawful arrest of Plaintiff Everard for violation Texas Penal Code § 42.01(a)(8); they had reasonable grounds to believe that Grisham was interfering with this arrest. Grisham avers that he was not interfering with Defendants' duties because any potential interference was merely verbal, which is a defense to prosecution. *See* TEX. PENAL CODE § 38.15(d) (defense to prosecution under this section that interruption, disruption, impediment, or interference alleged consisted of "speech only"). Even if the existence of a "speech only" trial defense is read to negate probable cause to arrest, Grisham's interference here was more than only speech. He continued to approach Everard while being instructed not to, and he stood between Viera and Everard. (Docket Entry 82-9, at 5:30–5:40.) These facts and circumstances would lead a reasonable officer to believe that Grisham's interference with Defendants' public duties was more than merely verbal.

Finally, as with Everard, even if there were a genuine dispute as to Grisham's constitutional false-arrest claim, Grisham points to no precedent that would clearly establish that it was unreasonable for Viera to believe that Grisham was interfering with the duties of a peace officer.[4]

---

[4] Defendants also assert a defense under the independent intermediary doctrine. (Docket Entry 81, at 17.) Under the independent intermediary doctrine, "if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party." *Wilson v. Stroman*, 33 F.4th 202, 208 (5th Cir. 2022) (citing *McLin v. Ard*, 866 F.3d 682, 689 (5th Cir. 2017).

18

Summary judgment should therefore be granted on Everard's Fourth Amendment unlawful arrest claim.

### 3.    *Unlawful Search and Seizure.*

Plaintiffs also bring claims under the Fourth Amendment for unlawful search and seizure. (Docket Entry 1, at 16.)   These claims are derivative of other claims already discussed above: Plaintiffs' briefing focuses on Defendants' use of force, and their complaint focuses on whether Defendants had probable cause to seize Plaintiffs. (Docket Entry 1, at 16; Docket Entry 86, at 29–31.)   As the undersigned has recommended that summary judgment be granted in Defendants' favor on these claims, it should likewise be granted on Plaintiffs' search and seizure claims.

### 4.    *Malicious Prosecution.*

Plaintiffs also bring claims for malicious prosecution.  In the Fifth Circuit, the claim for "malicious prosecution" was officially abolished by *Castellano v. Fragozo,* in  which the Court concluded there was no "freestanding constitutional right to be free from malicious prosecution."   352 F.3d 939, 945 (5th Cir. 2003).   Accordingly, the claim of malicious prosecution is a tort, not a constitutional violation; however, "the facts underlying these tort allegations may constitute unconstitutional searches, seizures, or violations of due process." *Morgan v. Chapman,* 969 F.3d. 238, 245 (5th Cir. 2020).  In this case, Plaintiffs have brought separate claims for unlawful arrest and retaliatory prosecution, which encompass the relevant facts underlying a possible tort claim. (Docket Entry 1, at 16.)  Therefore, summary judgment should be granted as to any constitutional claim of malicious prosecution.

---

Because Defendants had probable cause to arrest, the Court need not reach the issue of whether the independent intermediary doctrine would otherwise support summary judgment.

**B.**   ***Plaintiff's First Amendment Claims.***

Plaintiffs raise two First Amendment claims: (1) unlawfully preventing protected conduct; and (2) retaliation for protected conduct. (Docket Entry 1, at 13–15.) Because the two claims appear to substantially overlap, they are addressed together.

*Unlawful prevention.*   It is unclear what right Plaintiffs are asserting under the First Amendment with regard to their "unlawful prevention of protected conduct" claim.[5]   Such an "interference" claim may refer to the rights to assemble, to speak in a traditional public forum, or to petition the government.   In briefing, Plaintiffs reference their right to engage in protest on public streets and sidewalks.[6]  (Docket Entry 82; at 21; Docket Entry 86, at 27–28.)  Of course, in this case, the question is whether there was a right to *armed* protest, the violation of which would offend the First Amendment.

The right to protest in certain locales in covered by the Supreme Court's forum analysis: the three main types of forums are (1) traditional public forums; (2) designated public forums; and (3) nonpublic forums. *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018).   In traditional public forums like streets and sidewalks, "the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Id.*  Such forum analysis, however, is generally inapplicable to individual arrests under the color of non-speech related laws; rather, it

---

[5] The cases that Plaintiffs reference in their briefing involve either (1) public employees' right not to be terminated for exercising their freedom of speech, *e.g., Brawner v. City of Richardson, Tx.*, 855 F.2d 187 (5th Cir. 1988), or (2) private individuals' right not to be retaliated against for exercising their freedom of speech, *e.g., Keenan v. Tejeda*, 290 F.3d 252, 260 (5th Cir. 2002). (*See* Docket Entry 82, at 20–23; Docket Entry 86, at 27–28.) The first category of cases is irrelevant here; the second is addressed separately *infra*.

[6] They also discuss the right to film the police, which is also addressed *infra*.

is used to analyze prior restraints on speech. *See, e.g., Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020). Even if the forum analysis is applicable here, however, it would not support Plaintiff's § 1983 claims, as Plaintiffs have pointed to no precedent that would, in 2018, have clearly established their right to armed protest under the First Amendment. (*See* Docket Entry 81, at 20–23.)

The cases cited and relied upon by Plaintiffs are distinguishable. The majority of the cases cited were analyzed in the context of retaliation for filming police officers, which is discussed in more detail below. (*See* Docket Entry 96, at 27 n.161 (collecting cases).) Plaintiffs also rely on *Noles v. Dial* for the general proposition that the First Amendment prohibits the government from restricting, in traditional public forums, more than a "narrowly limited classes of speech." No. 3:20-CV-3677-N-BK, 2021 WL 4255640, at *4 (N.D. Tex. Aug. 25, 2021), *report and recommendation adopted sub nom. Noles v. Dial*, No. 3:20-CV-3677-N-BK, 2021 WL 4244780 (N.D. Tex. Sept. 17, 2021). In *Noles*, the plaintiff's arrest for carrying an obscene sign near a public highway was found to state a claim for violation of the First Amendment; such facts, in an unpublished case from another district, could hardly put a reasonable officer on notice that Plaintiffs were clearly entitled to engage in armed protest in this case. The other cited cases are similarly inapposite: *Ashcroft v. Am. C.L. Union* dealt with a statute restraining the display of "material that is harmful to minors" on the internet, 535 U.S. 564 (2002); *Doe v. Mckesson*, ultimately turned on the "professional rescuer" doctrine, 947 F.3d 874, 876 (5th Cir. 2020); and *Freedom From Religion Found.* dealt with a prior restraint on displaying festive exhibits in the Texas Capitol building, 955 F.3d at 427.

None of the above cases would put Defendants on notice that, on the date of the incident in 2018, Plaintiffs had a First Amendment right to bear arms as part of a protest.[7] Indeed, at the time, there was a robust debate in academic scholarship as to the existence of a First Amendment right to bear arms. *See, e.g.,* Katlyn E. DeBoer, *Clash of the First and Second Amendments: Proposed Regulation of Armed Protests*, 45 HASTINGS CONST. L. Q. 333, 337–40 (2018); Timothy Zick, *Arming Public Protests*, 104 IOWA L. REV. 223, 241–53 (2018). In sum, the contours of the law and legal discourse at the time of Plaintiffs' arrests was not sufficient to show "beyond debate" that there was a violation of the First Amendment in the circumstances of this case. *al-Kidd*, 563 U.S. at 741.[8]

---

[7] The Supreme Court has recently held that the Second Amendment guarantees a right to publicly carry a handgun. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). That such a right may exist under the Second Amendment does not necessitate that the Court find the right to exist under the First Amendment. Moreover, the Supreme Court made clear that the newly-announced Second Amendment right is "subject to certain reasonable, well-defined restrictions." *Id.* at 2156. In any event, no precedent clearly established the scope of, or restrictions on, either a First or Second Amendment right to publicly carry arms back in 2018.

[8] Because the right to armed protest was not clearly established, the District Court need not reach the issue of whether any constitutional right was violated. *Pearson*, 555 U.S. at 236. If it does decide to reach the issue, however, the Court should consider that significant precedent would support a restriction on the Plaintiffs' armed protest here. First, it unclear whether display of a firearm would necessarily be the kind of expressive conduct which would constitute protected speech. *See* DeBoer, *Clash of the First and Second Amendments*, at 342–45. Second, even if carrying weapons in the context of a Second Amendment protest might constitute speech, the government would still retain the right to reasonably regulate such speech. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). For example, a restriction on carrying weapons in protest could further the important interest in public safety interests or crime prevention. *See United States v. O'Brien*, 391 U.S. 367, 376–77 (1968). A restraint on firearm protests might also constitute a valid restraint on speech that is intimidating to others. *See Virginia v. Black*, 538 U.S. 343, 360 (2003); *Watts v. United States*, 394 U.S. 705, 708 (1969). And even if the First Amendment encompassed a general right to armed protest in a traditional public forum, the scope of the right would have to be analyzed "in light of the special characteristics of the [relevant] environment." *See Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503 (1969). In this case, the relevant context included that Plaintiffs were belligerent and noncompliant; it is at least questionable whether Plaintiffs have a right to behave in such a manner while armed under the First Amendment.

Even if Plaintiffs had demonstrated that a right to armed protest was clearly established in 2018, the factual evidence they present here is simply too conclusory to withstand summary judgment; in support of their First Amendment claim Plaintiffs present little more than general statements that the police violated their rights.  (See, e.g., Docket Entry 82, at 22 ("The Defendants simply chose to not allow Plaintiffs to express their views because of the messages they vocalized" (citing subsequently-filed federal complaint).))  Plaintiffs may not rely on "conclusory allegations" or "unsubstantiated assertions, "to create a genuine issue of material fact. *Freeman*, 369 F.3d at 860.

*Unlawful retaliation.*  Unlike the more general "prevention" claim discussed above, Fifth Circuit precedent clearly establishes that arrest or indictment in retaliation for protected speech violates the First Amendment. *See Keenan*, 290 F.3d at 260 (retaliatory criminal prosecutions may constitute actionable First Amendment violation); *cf. Colson v. Grohman*, 174 F.3d 498 (5th Cir. 1999) (false accusations and attempts to prosecute city councilor were not retaliatory because they did not result in arrest or indictment).  Such a retaliation claim requires that (1) the plaintiffs were engaged in constitutionally protected activity, (2) the defendants' actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated by the plaintiffs' exercise of constitutionally protected conduct. *Keenan*, 290 F.3d at 258.

In this case, Plaintiffs were, at least in part, engaged in constitutionally protected activity: filming the Defendant officers.  (Docket Entry 82-9, at 1:00, 2:30.)  Filming police officers engaged in their professional duties has been a clearly established right in the Fifth Circuit since 2017, before the arrests at issue. *Turner v. Lt. Driver*, 848 F.3d 678, 688–90 (5th Cir. 2017).  While Plaintiffs were partially engaged in protected conduct, however, a retaliatory criminal prosecution "in violation of the First Amendment [is] actionable only if a plaintiff can also prove . . . absence

of probable cause to prosecute." *Keenan*, 290 F.3d at 260.  As discussed above, Defendants did have probable cause to arrest both Plaintiffs.  Moreover, Plaintiffs cannot point to evidence creating a fact issue that their choice to film Defendants was motivation for their arrest and prosecution; at no time did Defendants order Plaintiffs to stop filming their activities or otherwise interfere with other members of the protest attempting to film their activities.  (Docket Entry 82-9, at 0:00–7:00.)  Therefore, summary judgment should be granted on Plaintiffs' First Amendment retaliation claims.

### C.  *Plaintiff's Fourteenth Amendment Claims.*

Plaintiffs raise Fourteenth Amendment claims for deprivation of property and failure to provide medical.  Each is addressed below.

#### 1.  *Deprivation of Property.*

Plaintiffs assert claims for deprivation of personal property under the Fourteenth Amendment.  They claim that Defendants deprived Plaintiffs of their property without due process of law when they "threw and destroyed Defendant Everard's camera, when they wiped the memory cards of Plaintiffs' go pro, and cellphones."  (Docket Entry 1, at 18; *see also* Docket Entry 89-8, at 4.)

The Fourteenth Amendment's due process clause has two components—(1) a guarantee of procedural protections when a state seeks to deprive an individual of protected liberty or property interests, and (2) a substantive protection against conduct that "shocks the conscience." *Jordan v. Fisher*, 823 F.3d 805, 810 (5th Cir. 2016).  Based on their pleadings, it appears that Plaintiffs allege violations of both procedural and substantive due process.  (Docket Entry 86, at 32–33.)  With regard to the procedural claim, it is well settled that "unauthorized intentional deprivation of property by a state official does not constitute a civil rights violation as long as the state provides

24

a meaningful post deprivation remedy." *Combs v. City of Dallas*, 289 F. App'x 684, 687 (5th Cir. 2008). The burden is on the complainant to show that the state's post-deprivation remedy is not adequate. *Hudson v. Palmer*, 468 U.S. 517, 539 (1984) (O'Conner, J., concurring). In this case, Plaintiffs have not provided any evidence as to the post-deprivation remedies available, nor have they shown that Texas's tort remedy of conversion is an inadequate remedy. *Combs*, 289 F. App'x at 687; *Murphy v. Collins*, 26 F.3d 541, 543–44 (5th Cir. 1994).

With regard to the substantive claim, Plaintiffs have not introduced any factual evidence[9] or applicable caselaw to demonstrate that Defendants' behavior "shocks the conscience," as would be required to sustain a due process claim in the police-action context. *See Rochin v. California*, 342 U.S. 165, 172 (1952).[10] Therefore, Defendants are entitled to summary judgment on Plaintiffs' deprivation of property claims.

      2.     *Grisham's Failure to Provide Medical Care Claim.*

Plaintiff Grisham brings a claim for failure to provide timely medical care. (Docket Entry 1, at 18–19.)[11] To establish liability based on a delay in medical treatment, a plaintiff must show

---

[9] The only evidence Plaintiffs cite is a declaration by Plaintiff Grisham as to the events of his arrest; it does not state that Everard was deprived of any property, including the property noted in the complaint. (Docket Entry 79-4; Docket Entry 86, at 33.) The undersigned has conducted, on his own initiative, an independent review of other evidence in the record and cannot find other support of Plaintiffs' proposition.

[10] The Supreme Court has recently raised questions as to the scope of clearly-established substantive due process rights under the Fourteen Amendment. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246–48 (2022). This is turn could impact upon whether qualified immunity could apply to the due process claim in this case. But given Plaintiffs' failure to make the necessary showing, the Court need not reach this issue.

[11] Although the complaint nominally asserts medical-care claims for both Plaintiffs, the alleged facts and summary judgment briefing make clear that the claim was brought *only on behalf* of Plaintiff Grisham. (Docket Entry 86, at 33–34.)

that officials (1) "had subjective knowledge of a substantial risk of serious harm to the detainee" due to a serious medical need and (2) "responded to that risk with deliberate indifference." *Cope v. Cogdill*, 3 F.4th 198, 206–07 (5th Cir. 2021) (citation omitted).[12]  Under the first prong, "[a] serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006).  Under the second prong, a plaintiff can show deliberate indifference by introducing evidence that an official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006).  Although deliberate indifference requires egregious conduct, a plaintiff need not prove that the official acted with the intent to cause harm. *Cope*, 3 F.4th at 207 (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).  Nevertheless, "deliberate indifference" sets "an extremely high standard to meet." *Gobert*, 463 F.3d at 346 (internal quotation marks and citation omitted).

Grisham specifically complains that Defendants "did not remove the [taser] probes at the scene and further intentionally waived off any medical personnel from coming to the scene." (Docket Entry 86, at 34.)  In context, however, Grisham has not shown deliberate indifference to his serious medical needs.  The undisputed evidence in the case reveals that, after Grisham was arrested, he was driven straight to the police station, where Emergency Medical Services ("EMS") arrived to provide services in the patrol vehicle.  (Docket Entry 82-12, at 8:40–14:55.)  Based on the video evidence available, the total time between when Grisham was tased and when he received medical treatment was about thirteen minutes.  (*Id.* at 5:40–18:07.)  During this time, Grisham was

---

[12] Pretrial detainees and convicted inmates are owed the same duty under the Fourteenth and Eighth Amendments with regard to basic human needs, including medical and safety needs. *Cadena v. El Paso Cty.*, 946 F.3d 717, 727 (5th Cir. 2020).

arrested, (*id.* at 5:59–6:12), searched, (*id.* at 6:32–6:56), placed into the vehicle (*id.* at 7:40), and driven to the police station, all of which took about six minutes (*id.* at 7:40–13:10). In the interim, Grisham was conscious, alert, and communicative; he had a wound to the head but was not bleeding profusely or showing other obvious signs of a serious medical condition. (*Id.* at 7:40–13:10.) EMS arrived at the station two minutes after Grisham did. (*Id.* at 14:50). When Defendants attempted to move Grisham from the police vehicle to a cell where he could be treated by EMS, Grisham told them that he felt dizzy and couldn't walk. (*Id.* at 15:36.) Defendants then spent a short time, less than three minutes, trying to assist Grisham to a cell, before EMS decided to treat Grisham while he was still inside the police vehicle. (*Id.* at 15:36–18:08.)

Grisham can point to no evidence that Defendants either were subjectively aware that his condition was so severe that treatment should have been administered at the scene, rather than thirteen minutes later at the police station; indeed, there was no evidence that the condition was in fact of that severity. *See Cleveland v. Bell*, 938 F.3d 672 (5th Cir. 2019) (nurse had no reason to be subjectively aware of detainee's serious medical need even though detainee had previously been in infirmary, complained of lethargy and inability to move, defecated on himself, and was largely uncommunicative to the prodding of jail personnel). The Fifth Circuit has found that a delay of even several hours after a medical incident did not violate a detainee's rights, in a situation where officials had more reason to believe that the plaintiff was seriously injured. *See Cadena*, 946 F.3d at 729 (County took plaintiff with visibly broken leg to emergency room "the same night" after she fell at 4:30 P.M.).

Grisham has not introduced evidence that Defendants violated his constitutional right to medical care. Summary judgment should be granted on this claim.

### D.    *Plaintiffs' Remaining Claims.*

1.    *Failure to Intervene.*

Plaintiffs claim that Defendants failed to intervene when other Defendants violated their constitutional rights.  (Docket Entry 1, at 16–17.)  An officer may be liable under § 1983 in an excessive force case under a theory of bystander-liability if the officer: (1) knows a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017); *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013).  The rationale underlying the bystander-liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer. *Whitley*, 726 F.3d at 647.

In this case, the undersigned has recommended that summary judgment be granted as to all underlying § 1983 claims committed by the individual officers which might serve as the basis for Plaintiffs' failure to intervene claims.  Therefore, summary judgment should be granted on these claims.

2.    *Municipal Liability.*

Plaintiffs also bring a claim against the City for violating their constitutional rights. (Docket Entry 1, at 21–22.)  Municipalities can be held liable for violating a person's constitutional rights under § 1983, but only in limited circumstances. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  "[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy. . . ." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694.)  An official policy need not be a written policy; it may also constitute "a widespread practice that is so common and well-settled as to constitute a custom that fairly

28

represents municipal policy." *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 413 (5th Cir. 2015).

Plaintiffs allege that the City had "a policy practice or custom to deprive Plaintiffs and other open carry activists of their [F]irst [A]mendment rights." (Docket Entry 1, at 21.) The undersigned has recommended that summary judgment be granted as to all the § 1983 claims against the individual officers which could serve as the necessary underlying constitutional violation, in part because Plaintiffs have not created a fact issue as to whether Defendants violated their First Amendment rights. Because there have been no underlying constitutional violations, the City also cannot have violated Plaintiffs' constitutional rights. *See Piotrowski*, 237 F.3d at 578. Therefore, summary judgment should be granted on Plaintiffs' municipal liability claims.

## V.     Conclusion and Recommendation.

Based on the foregoing, I recommend that Defendants' Motion for Summary Judgment (Docket Entry 81) be **GRANTED** and Plaintiffs' Motion for Partial Summary Judgment (Docket Entry 82) be **DENIED**.

## VI.     Instructions for Service and Notice of Right to Object/Appeal.

The United States District Clerk shall serve a copy of this Report and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested. Written objections to this Report and Recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). The party shall file the objections with the clerk of the court, and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions or recommendations to

which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections. A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Report and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

  **SIGNED** on July 22, 2022.

Henry J. Bemporad
United States Magistrate Judge